**Fred D. TEMPLE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. Nos. 971, 1077.**

United States District Court
S. D. Mississippi, E. D.
May 5, 1964.

688

J. C. Floyd, of Floyd, Cameron & Deen, Meridian, Miss., for plaintiff.

Robert E. Hauberg, U. S. Atty., Jackson, Miss., Hubert Doster, Wes Watkins, Attys. Department of Justice, Washington, D. C., for defendant.

MIZE, District Judge.

At the conclusion of the trial I made a tentative finding of fact, as shown by the record, but upon request of counsel I permitted briefs to be filed, which I have studied and considered carefully, along with the record, and am of the opinion that the plaintiff is entitled to recover the sums sued for.

I adhere to the findings of fact I made at the conclusion of the trial, but will amplify them and state more in detail the facts and issues involved and will state the law as I construe it, applicable to the facts shown.

The statute and regulations pertinent to the years 1951 and 1953 covering case #971 are as follows:

"§ 117.  Capital gains and losses

"(a) Definitions.  As used in this chapter—

"(1) Capital assets.  The term 'capital assets' means property held

by the taxpayer (whether or not connected with his trade or business), but does not include—(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; (B) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 23(*l*), or real property used in his trade or business; * * * an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue. * * *

"(4) Long-term capital gain. The term 'long-term capital gain' means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income; * * * "

Sect. 117(j):

"(j) Gains and losses from involuntary conversion and from the sale or exchange of certain property used in the trade or business.

"(1) Definition of property used in the trade or business. For the purposes of this subsection, the term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(*l*), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the

taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *. Such term also includes timber or coal with respect to which subsection (k) (1) or (2) is applicable. * * * "

"INCOME TAX REGULATION 118 Vol. XXXIV, No. 40, Part 2, October 1, 1953:

"Page 7036, Section 39.22(a)–11 SALE OF REAL PROPERTY IN LOTS. If a tract of land is purchased with a view to dividing it into lots or parcels of ground to be sold as such, the cost or other basis shall be equitably apportioned to the several lots or parcels and made a matter of record on the books of the taxpayer, to the end that any gain derived from the sale of any such lots or parcels which constitutes taxable income may be returned as income for the year in which the sale is made. This rule contemplates that there will be gain or loss on every lot or parcel sold, and not that the capital in the entire tract may be recovered before any taxable income shall be returned. The sale of each lot or parcel will be treated as a separate transaction and gain or loss computed accordingly. * * * "

The provisions of the Internal Revenue Code of 1954 pertinent here to case #1077 involving the years 1957 and 1958 are Section 1221 and Section 1237 of the Code of 1954 and paragraph 1.1221–1 and paragraph, 1237–1 of the regulations promulgated by the Commissioner applicable to the appropriate sections of the 1954 Code which are too lengthy and voluminous to undertake to set forth here.

The plaintiff in all of the tax years here involved was an individual engaged in the roofing and building supply business and was not a licensed real estate dealer, broker or agent.

In January of the year 1950, he took an option to purchase a certain tract of

land in the Northwest part of the corporate limits of the City of Meridian known as the Beeson College property, approximately 30 acres. The property was formerly the site of a female college.

The purpose of the plaintiff in purchasing the land was for an investment, or rather for the purpose of changing the form of investment he then held, towit: U. S. Savings Bonds, because he was dissatisfied with the rate of return on the bond investment and was convinced that real estate in the particular vicinity of the Beeson College property would enhance in value with the passage of time. The plaintiff bought the property as a whole and on several occasions offered it for sale to different prospective purchasers as a whole but was not able to make a satisfactory disposal of it in that manner.

During the term of the option period, the plaintiff had a topographical survey made of the surface of the property to assist him in reaching a determination as to whether or not he should exercise his option for which he paid $300.00, and to take the deed under the option for which he would be required to pay a total of $30,000.00. He decided to exercise his option and did pay for and obtain the deed to the property on April 29, 1950 as an investment.

Up to the time plaintiff acquired the option there was no law or ordinance in the City of Meridian which required anything to be done for the subdivision of property into blocks and lots other than the preparation and filing in the office of the Chancery Clerk of Lauderdale County, Mississippi, a map of such subdivision and then presenting such recorded map to the City of Meridian for its approval as an official subdivision of the City of Meridian.

Such acceptance by the City amounted to a public dedication of the streets and alleyways shown on the subdivision map for public purposes by the maker and owner of such subdivision map and the acceptance thereof by the city officials.

In the month of July 1950 after the plaintiff had acquired title to the property, he discovered that the City of Meridian had adopted a new subdivision ordinance which changed the procedure and requirements for the acceptance by the City of a subdivision to the extent that large, expensive improvements had to be made by the owner, such as street constructions, sewer constructions, water mains, clearing, grubbing, etc.

When the taxpayer found out that such new ordinance had been passed, he appeared before the City Council and pled with them to exempt him from the operation of the new ordinance, before the new and expensive requirements of the subdivision ordinance went into effect inasmuch as he had bought the property in good faith, and placed his entire available capital in the purchase price of the land.

By negotiating with the City Council it was determined that if the plaintiff would do certain things in the nature of improvements but not to the extent required by the new ordinance and that if he would build a number of houses on some of the lots the city officials agreed that he might proceed with having his property subdivided into blocks and lots, file his map for record and present the same to the City and that it would be accepted. The plaintiff agreed with the city officials to do this and thereafter he had the subdivision map prepared, filed for record and presented to the City Council, and it was accepted by the City Council as an official subdivision of the City of Meridian in September of 1950.

Thereafter in the year 1951 in pursuance to his agreement with the city officials the plaintiff did make the improvements required, such as street construction, drainage, etc., at a total cost of approximately $12,000.00, which in effect increased his costs in the subdivision from the purchase price of $30,000.00 to a total of approximately $42,000.00 for the land and improvements which he was required to make.

He proceeded to build ten houses in the year 1951. Not having sufficient capital of his own for the purpose of

constructing such houses, plaintiff borrowed from the First National Bank in Meridian a substantial portion of the cost of such construction and was anxious to liquidate this indebtedness to the bank as early as possible.

He sold the ten houses and the lots on which they were located in the year 1951. He did not solicit any customers. All of the sales were made to purchasers who had gone to plaintiff with the request to purchase. All of the sales were made to veterans who were eligible for GI loans. The property was not listed with any real estate agent. Only small, insignificant classified advertisements, one for the year 1951 and two for the year 1953, were placed in the newspaper. A sign was placed on the southwest corner of the subdivision reciting "Morningside Subdivision, Meridian's Newest Subdivision, Fred D. Temple, Owner."

There were no solicitations for sales and no other promotional activities. There was no office on the property and the only office plaintiff had over the entire period involved in these two cases was his office at the Magnolia Roofing & Supply Company at least three miles away from the subdivision. The plaintiff hired competent builders to build the ten houses at a weekly salary of $80.00 and the builders ordered such material as they needed from plaintiff's building supply business. They presented to him weekly the payroll for labor. Plaintiff furnished to the builders money with which to meet their payrolls. He exercised no supervision over the construction of buildings other than going by the construction sites on occasions when he was in the city, on his way to lunch or to his home at night.

Plaintiff being in the building material business considered that the profit made on the building material which went into the construction of the houses was ordinary income to him and he so reported and paid his tax thereon. He was convinced that he was entitled to capital gain treatments on sale of land, he having owned and held such land longer than the statutory period of six months required by the statute for capital gain treatment.

He arrived at his basis of the cost of the lots by taking the entire cost of the land included in the subdivision, and dividing it into the number of lots. He then arrived at the sale price of the land (lots) by taking the figure shown in the Veterans Administration Certificate of Reasonable Value for the land in its appraisal for the purposes of making the loan to its veteran customers, the difference between his unit cost and the Veterans Administration Certificate of Reasonable Value was the measure of his profit on which he returned and paid capital gain tax. The Internal Revenue Department took no exception to and made no objection to this method of arriving at the gain but it did take exception to the capital gain treatment with the contention that plaintiff was in the real estate business and that the lots and subdivision were held by him for sale to customers in the ordinary course of business, and therefore, should be given ordinary income tax treatment.

Practically the same situation existed in the year 1953 except that plaintiff only built and sold five houses and the lots on which they were located, there having been no sales of the year 1952.

In the years 1957 and 1958 there were no houses built or sold but only vacant lots sold and the same course of action and the same kind of activities or lack of activities were engaged in by plaintiff.

However, certain other things occurred which did change the plaintiff's course of action in that it caused him to speed up the liquidation of his investment.

These things were principally:

1. In the year 1956 a substantial increase in the tax assessment was made both by the City of Meridian, the County of Lauderdale and the State of Mississippi.

The taxing authorities of both governments took the position that plaintiff was not developing the property fast enough to suit the authorities, they insisting

for revenue purposes that they wanted the property improved, developed and construction placed thereon in order to increase the assessed value of the property and consequently produce increased revenue.

2. Then in the year 1959 the City of Meridian instituted an expensive paving program and over the protest of the plaintiff paved all of the streets and avenues in the subdivision which had not theretofore been paved and assessed the cost of such improvements against the abutting property owner.

This made the tax and special improvement assessment so heavy and burdensome that plaintiff could not carry the burden and continue to own the property.

3. In the meantime, he had developed ulcerated stomach, diabetes and other health troubles, and his income being materially reduced, he was unable to hold the property longer. Therefore, he was forced to liquidate his entire investment in the land, most of which he had held for thirteen years and would have liked very much to have held longer, but by the force of circumstances as indicated above he was unable to do so.

The differences between the plaintiff and the defendant here in both cases arise out of an interpretation of the definition of capital assets.

Case #971 involving the years 1951 and 1953 is governed by the language of Section 117 as hereinbefore quoted, which says that " 'capital assets' means property held by the taxpayer, * * * but does not include * * * stock in trade * * * or other property of a kind which would be properly included in the inventory of the taxpayer * * * or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * * held for more than 6 months".

■ The evidence shows in this case, and I so find, that lots in the subdivision were not included in the plaintiff's inventory and that they were not held for sale to customers in the ordinary course of his trade or business.

The taxpayer's business was the Magnolia Roofing and Supply Company and the lots in this subdivision could not, under the facts of this case as shown by the testimony, meet the definition of being held for sale to customers in the ordinary course of business.

The evidence is, and I so find, that the taxpayer bought this property for an investment and such sales of it as he made were brought about by the force of circumstances over which he had no control and not because the plaintiff wanted to liquidate his investment. The regulations under Section 117 of the Internal Revenue Code of 1939 as quoted above simply require that in case of subdivision of real property that the cost be apportioned and a matter of record on the books of the taxpayer be made to the end that each sale must be treated as a separate transaction and not as a return of capital.

The testimony of the taxpayer and the tax returns filed in this case show that this regulation was complied with by the plaintiff.

The years of 1957 and 1958 involved in case #1077 are governed by the Internal Revenue Code of 1954, Section 1221 which contains the definition of capital assets which is for all practical purposes the same as the definition in the 1939 Code so far as it is applicable here.

The amplification comes in Section 1237 of the Code of 1954, which is intended as an effort on the part of Congress to straighten out the Commissioner of Internal Revenue because he had gone so far afield from the intentions of Congress as to capital assets and capital gain treatment for the income derived from the sale of such capital assets.

■ The Commissioner had taken the position over the years with increasing regularity and some support from courts other than the Fifth Circuit that the mere fact of subdivision of real estate put the owner in the real estate business and, ipso facto, constituted the owner as

holding the lots for sale to customers in the ordinary course of his business. This will not do. It is not the law.

In some cases where the taxpayer has contended for capital gain treatment on the land as well as the building constructed on the land where completed for the statutory period, the Commissioner has allowed the capital gain treatments for the land, but denied such treatment for building and in the case of Paul v. Commissioner, 206 F.2d 763 (3CCA), the court there held that the taxpayer was entitled to capital gain treatment on both the land and the building or that part which has been completed for more than six months. The plaintiff here did not and does not contend for capital gain treatment for the revenue derived from the building, but only the land.

On the question of whether or not real estate dealers or taxpayers who have subdivided or sold numerous parcels of real estate are entitled to capital gain treatment on such sales which have occurred, many courts in the last few years have developed certain tests which may be used in resolving the issue, but most of them say that each case must be decided on its own particular facts.

The objective tests developed by the courts in the consideration of this matter and the various cases seem to be principally and primarily whether the property is held for the sale to customers in the ordinary course of trade or business; frequent and continuity of sales; sales activity of the seller, or those acting in his behalf; the extent and substantiality of the sales, the intent of the purchaser and the purpose and nature of the acquisition of the property.

In this case here the taxpayer's own evidence is to the effect, and I find as a fact, that he acquired this property for the purpose of an investment and this evidence of his is borne out by corroborating evidence such as his banker's testimony, his book entry made in his own handwriting at the time of the investment before any question thereasto had arisen.

It is the law that notwithstanding the fact that a person is engaged in a business in which he sells goods or other property to customers in the usual course of his trade or business that, nevertheless, he may also invest in similar property and not be deprived of his right to capital gain treatment. In the event he disposes of his merchandise, whatever it may be, to a customer the only test or requirement which Congress set up in its statutory definition of capital assets was assets which would not be of a kind which properly would be included in the inventory of the taxpayer and not held by the owner for sale to customers in the ordinary course of business and that it be held for a period of at least six months.

While a taxpayer may change his intent and perform such acts as to make him in the real estate business, yet the facts here do not warrant the application of this principal because the plaintiff bought the property for an investment, sought to hold it as an investment and only took such action with reference to subdivision, liquidation, and sale, as he was forced to do by circumstances arising which were not forseeable at the time of his original purchase.

There is no evidence in the record of any change of intentions on the part of the plaintiff to immediately liquidate his investment in the real estate by the sale of all of the lots in the usual course of business, and he held on to such part of his investment as he could, over the years, and did not entirely liquidate such investment for a period of thirteen years.

If the court should hold that to carry to its logical and ultimate conclusion, the theory that the purpose at the time of the sale is controlling would in effect eliminate Section 117(j) of the Revenue Code of 1939 and Section 1221 of the Code of 1954 because, naturally, there is a purpose to sell any time a sale is made, or, as expressed by the Tax Court in an opinion of Walter R. Crabtree, 20 T.C. 841 (1953), "In the instant case, to reach the conclusion for which respondent

(Revenue Commissioner) contends would be tantamount to saying that a dealer in real estate could never sell a defense housing project and accord capital gain treatment to such profit as may arise therefrom. To so hold would be a clear usurpation of the legislative prerogative."

As to the sales activity of the plaintiff, the record shows and I so find that he placed his lots for sale with no real estate agent, he had no real estate office, but only a roofing and building supply office. He made no aggressive selling campaign himself, he solicited no customers or purchasers for his lots. They all came to him for the purpose of purchasing. He refused numerous offers to purchase. He could have sold all of the lots in any one year if he had so desired. He did place three small classified advertisements over the years for sale of the houses in which he had substantial borrowed capital invested, but offered no lots or real estate for sale in such advertisements.

Plaintiff had no prior experience or record of subdividing any other property, or building any other houses for sale. He did not subdivide any other property or build any other houses for sale at any time before or since the subdivision here involved.

■ About the time the plaintiff here took the option to purchase this land, the Fifth Circuit Court of Appeals on January 6, 1950, decided the case of Dunlap v. Oldham Lumber Company, reported in 178 F.2d 781, and the plaintiff was entitled to rely on the pronouncement of the court in that case.

There the Internal Revenue Service was arguing on the other side of the question posed here because there a loss was involved rather than a gain and the taxpayer was contending the loss was ordinary for a greater deduction. In that case Circuit Judge Russell said:

"It may be conceded that in voluminous tax litigation which has involved determination of the status of property as 'capital assets' or oth-

erwise, shifting positions have been taken by the tax gatherers and the taxpayers, depending upon their respective desires and the advantages to be obtained under the conditions with which they respectively found themselves surrounded. Nevertheless, certain well recognized tests for the determination of the status of property, as to whether 'held by the taxpayer primarily for sales to customers in the ordinary course of his trade, or business' have been laid down. Thus, a most important factor is continuity of sales and sales related activity over a period of time. As well said in Snell v. Commissioner, as to the 'business' referred to in the statute, 'the word, notwithstanding disguise in spelling and pronunciation, means busyness; it implies that one is kept more or less busy, that the activity is an occupation. It need not be one's sole occupation, nor take all his time.'
* * *

"Even if there could be any possible room for disagreement as to the above view of the evidence, clearly there can be no dispute of the proposition that under the evidence here there is no basis for a finding that there were sufficient sales transactions to show that such sales of real estate were an ordinary course of such business of the taxpayer. Such sales as were shown were extremely infrequent, and utterly fail to establish any 'ordinary course of business' of the taxpayer as to the sale of the lots. The conclusion is inescapable that the sale of the lots was most extraordinary and not at all ordinary, and there was no ordinary course of business as to lot sales. By the express terms of the statute property must not only have been 'held primarily for sale,' but also for sale in the 'ordinary course of the business of the taxpayer.' In these circumstances, we need not concern ourselves with any discussion of the word 'customer.' Under

the circumstances here disclosed, the testimony as to the intention of the taxpayer in the acquisition of the lots is not legally material."

In the case of Goldberg v. Commissioner, 223 F.2d 709 (5 CCA—1955) before Hutcheson, Chief Judge, Tuttle and Jones, Circuit Judges, opinion by Justice Tuttle, the facts and holdings from the opinion show that the taxpayer had bought property for rental. This property was near the city of Dallas, Texas, and during World War II there was a boom. Later, it was decided to make sales of the property in individual sales. These sales were for the years 1943–46. This was held to be a liquidation of capital assets. The sales were frequent and continuous but since the circumstances were favorable to selling to individuals and the project was a large one, this was held to be entirely consistent liquidation of it as an investment. Houses were sold at established FHA prices. There was no evidence of any promotional activity, or that taxpayer used proceeds to buy and sell other houses. There were frequency and continuity of sales over a very short period of time but these facts alone were not sufficient to support a finding of the ultimate fact that the petitioner was "in the business".

Some of the tests which the court used was the test of intention when the property was acquired. The court seemed to say that this was an important test but not the controlling test. It is important since it will take some significant evidence to counter-balance the testimony of the taxpayer that he did in fact buy it for an investment.

■ The courts do not deny capital gain benefits simply because a large number of sales are made in a short period or if the owner has a large number of houses on lots on the seller's market. It is quite possible he may sell them continuously without any sales promotion or solicitation. In the case of Smith v. Dunn, 224 F.2d 353 (5 CCA—1955) before Hutcheson, Chief Judge, Tuttle and Cameron, Circuit Judges, opinion by Judge Cameron, the court again set up the guide line for the tests to be applied and said "the ingredients of the tests as evolved and defined in our decisions are these: (not quoting the language of the opinion but abbreviating it)

1. The nature and character of the taxpayer's title.

2. The reason, the purpose and the intent of the acquisition.

3. The period that the taxpayer held the property before the sales.

4. How many offices did the taxpayer have and were these offices for his main vocation.

5. Whether his engagement in the additional business was separable from the taxpayer's investment in the property.

6. The extent of the taxpayer's activity and "busyness".

7. Were the sales in question done through a representative or by the taxpayer himself.

8. Character and degree of control taxpayer exercised over the sales.

9. Number, extent, continuity and substantiality of sales.

10. The extent of subdividing, developing and advertising.

11. The pressure or lack of pressure upon prospective purchasers.

The opinion in reversing the finding of the lower court said "The court below seemed to have had the idea that any taxpayer who seeks to make a better sale of a capital asset consisting of land forfeits the right to claim profits as capital gain by the mere fact of subdividing and seeking out purchasers even though he does this by a regular real estate broker", which proposition the court rejected.

See also the case of Ross v. Commissioner, 227 F.2d 265 (5 CCA—1955).

■ In the case of Thomas v. Commissioner, 254 F.2d 233 (5 CCA—1958) before Hutcheson, Chief Judge, Tuttle and Jones, Circuit Judges, opinion by Justice Jones, the court said that while the purpose for which property is purchased is a factor for consideration, the purchase and holding of land for sale does

not, per se, require a determination that the property was held in the ordinary course of the trade or business of the purchaser. There the taxpayer had a real estate broker's license and had a desk in his father's office and his father was a real estate broker, but the subdivision involved was the only instance where the taxpayer was involved in subdividing activities. The court there held the taxpayer was entitled to capital gain treatment and said "We need not again set forth the usual applicable tests in resolving cases of this kind," citing Smith v. Dunn, supra, and other cases, and further said "[n]or need we labor the point that such cases are primarily fact cases", citing King v. Commissioner, 189 F.2d 122, (5 CCA—1951), certiorari denied, 342 U.S. 829, 72 S.Ct. 54, 96 L.Ed. 627 and other Fifth Circuit cases. See also Barrio's Estate v. Commissioner, 265 F.2d 517 (5 CCA—1959).

There are a good many other cases from the Fifth Circuit holding that under circumstances similar to the situation of the plaintiff here taxpayers are entitled to capital gain treatment on the sale of lots. Consolidated Naval Stores v. Fahs, 5 Cir., 227 F.2d 923 (1955), Cole v. Usry, 294 F.2d 426 (1961), Fahs v. Crawford, 5 Cir., 161 F.2d 315 (1947), Alexander v. Commissioner, 5 Cir., 224 F.2d 788 (1955).

█ Counsel for the Government has cited a number of cases contending they support a different conclusion from the one hereinabove reached. However, these authorities cited by counsel are not applicable to the facts of this case. Practically every lawsuit is controlled by the peculiar facts shown in that particular case. It frequently occurs that circumstances of slight weight will be sufficient to turn the scales in favor of a different conclusion than that which would be reached in the absence of such circumstances. The authorities cited by the Government I do not think are applicable here because a careful reading of those authorities will show there were additional facts that supported the conclusion reached in those particular cases. I think that under the facts of this particular case the authorities hereinbefore referred to and cited are sufficient to compel the judgment that I reached herein.

An order will be drawn in accord herewith, filed, and copy mailed to each of you.