GEORGE V. BUONO, JOHN R. FIORINO AND MARGARET H. FIORINO, THOMAS F. KANE AND JUDY K. KANE, FRANCIS A. MILLER AND BARBARA A. MILLER, BEN ROBERTS AND SYLVIA ROBERTS, AND HENRY E. TRAPHAGEN AND EDITH M. TRAPHAGEN, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3504–78.    Filed April 29, 1980.

*Phillip Lewis Paley,* for the petitioners.
*Marwin A. Batt,* for the respondent.

NIMS, *Judge:* Respondent determined deficiencies for 1973 for the following individuals:

George V. Buono .............................................. $9,621
John R. and Margaret H. Fiorino........................ 17,550
Thomas F. and Judy K. Kane ............................. 35,420
Francis A. and Barbara A. Miller...........................8,750
Ben and Sylvia Roberts.......................................7,543
Henry E. and Edith M. Traphagen...................... 10,214

Respondent also asserted an addition to tax for 1973 under section 6653(a) against Thomas F. and Judy K. Kane in the amount of $1,771. Although separate notices of deficiency were sent to the various petitioners, a single petition was filed by all petitioners, as permitted by Rule 34(a)(1), Tax Court Rules of Practice and Procedure, and the case was tried and briefed as a consolidated case.

Concessions having been made, the issues for decision are:

(1) Whether the sale of certain real property constitutes the sale of a capital asset within the meaning of section 1221,[1] thus entitling the petitioners to report the income therefrom as capital gain; and

(2) Whether the activities of certain shareholders should, under sec. 1.1375–1(d), Income Tax Regs., be imputed to petitioners' subchapter S corporation for purposes of determining the character of the gain from such property's sale.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation, together with the exhibits attached thereto, is incorporated herein by this reference.

The petitioners' legal residences on the date the petition was filed were as follows:

---

[1]All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

George V. Buono ......................... New Brunswick, N.J.
John R. and Margaret H. Fiorino..... Matawan, N.J.
Thomas F. and Judy K. Kane ......... Summit, N.J.
Francis A. and Barbara A. Miller..... Matawan, N.J.
Ben and Sylvia Roberts.................. Matawan, N.J.
Henry E. and Edith M. Traphagen... Wickatuch, N.J.

In 1973, a corporation known as the Marlboro Improvement Corp. (referred to hereinafter as Marlboro Improvement) sold some real property which gave rise to recognizable gain. During 1973, each of the male petitioners were shareholders of Marlboro Improvement,[2] a corporation which had elected to be treated as a small business corporation under subchapter S of the Internal Revenue Code. Each shareholder reported his aliquot share of the net proceeds from the sale on his 1973 tax return as gain from the sale of a capital asset.

In 1967, petitioner Henry Traphagen learned that a neighbor, Kenneth V. Hayes, was interested in selling a large tract of farmland.[3] With the exception of a 1-acre portion which was to be retained for a personal residence, Hayes wanted to dispose of the entire tract as he had recently retired from farming. The property was located in the township of Marlboro, Monmouth County, N.J. (referred to hereinafter as Marlboro or the town), about a half mile from Traphagen's residence, and consisted of approximately 130 acres.

Traphagen believed that acquisition of this property would present a good opportunity for financial gain. Up until that time, there had been minimal residential development in Marlboro because many residents wanted to preserve the town's rural atmosphere. Traphagen feld that a significant market for the sale of residential property had resulted from the town's antidevelopment climate. For example, he was aware that Monmouth Heights, a successful residential development having over 300 homes, had been built approximately one-third of a mile from Hayes's tract.

Traphagen also realized that property which had been ap-

---

[2]Petitioners Margaret H. Fiorino, Judy K. Kane, Barbara A. Miller, Sylvia Roberts, and Edith M. Traphagen are parties to this proceeding as a result of having filed joint returns with their respective spouses.

[3]Although Hayes owned the property jointly with his wife, the property was sold mainly through his efforts. Thus, for purposes of convenience, we will refer solely to Mr. Hayes.

proved for subdivision was significantly higher in value than raw land. In this context, approval of a subdivision plan means that the local municipality has authorized the respective sizes for each building lot within a tract as well as the layout for streets, sewers, sidewalks, and any commercial areas. As a consequence, developers of residential housing are generally willing to pay a premium for land which has already obtained subdivision approval.

At the time, the zoning ordinance of Marlboro Township provided for 40/30 or three-quarter-acre zoning. Under this ordinance, 40 single-family residences could be built per 30 acres of land. In other words, each building lot was required to contain three-quarters of an acre of land. During the negotiations with Hayes, Traphagen informally approached the Marlboro Planning Board to ascertain whether an application for subdivision approval pursuant to the 40/30 zoning ordinance would encounter any difficulty. Members of the planning board informed Traphagen that he would not have any problems in processing an application under the current zoning ordinance.

Hayes and Traphagen agreed to a purchase price of $2,200 an acre. After this final price was negotiated, Traphagen contacted a longtime friend, petitioner John Fiorino, and asked him if he would be interested in jointly purchasing Hayes's property as Traphagen felt that the transaction was too large to handle alone. Fiorino agreed to join Traphagen in this venture.

A contract for purchase of the property was executed on December 11, 1967, with both Traphagen and Fiorino as parties thereto. The total net purchase price was $270,600.[4] Hayes received $20,000 on the signing of the contract with an additional $30,000 due on April 30, 1968. The balance of the purchase price was to be financed by a purchase-money mortgage held by Hayes. No principal payments were due until 4 years after the closing date.[5] Interest on the mortgage was set at 6 percent and due quarterly.

Soon after the purchase contract was executed, Fiorino and

[4]This figure was based on the sale of an estimated 123 acres and was subject to an exact computation based on the actual number of acres in the tract. The actual number of acres was subsequently determined to be 130.6.

[5]Although the closing occurred on June 19, 1968, the date for computing the accrual of interest and the due date for principal payments was May 31, 1968.

Traphagen sought other investors to join them. Both realized that the transaction, with all of its attendant financial burdens, was too large for them to manage by themselves. The additional people who entered into the transaction comprise the remaining petitioners in this case. All were personal friends of either Fiorino or Traphagen (or both).

The petitioners agreed that a corporation would be formed to hold the property with each petitioner being entitled to a percentage interest commensurate with his respective capital contribution. Accordingly, Marlboro Improvement was formed on June 19, 1968, under the laws of New Jersey with Traphagen, Fiorino, and petitioner Francis A. Miller listed as the incorporators.

Marlboro Improvement's shareholders and the respective shares each held were:

| Name | Shares | Percent |
|------|--------|---------|
| Buono | 40 | 10 |
| Roberts | 60 | 15 |
| Miller | 60 | 15 |
| Traphagen | 60 | 15 |
| Kane | 80 | 20 |
| Fiorino | 100 | 25 |

In addition, Marlboro Improvement elected to be taxed as a small business corporation under the provisions of subchapter S, subtitle A, of the Internal Revenue Code.

On June 19, 1968, Hayes transferred the property to Marlboro Improvement by deed. The final purchase price was $286,374. As the corporation was credited with a $50,000 downpayment, the amount of the purchase-money mortgage was $236,374.

The petitioners, generally, were in agreement that the property would be held for about 1½ years. They intended to sell the entire tract intact as there were no plans to develop the property and dispose of it in separate lots. However, as it was apparent that an approved subdivision plan would significantly enhance the property's marketability and value, soon after the property was acquired, Marlboro Improvement undertook the preliminary steps needed to process a subdivision application.

In connection with its subdivision application, Marlboro Improvement was required to submit a plan setting forth the boundaries of the respective lots as well as the street plans for

the tract. Marlboro Improvement retained engineers to draft a map (or sketch plat) showing the division of land into the respective lots, the street layout, and the proposed location of water and sewer lines. In order to prepare the map, the engineers took numerous topographical surveys of the land.

On December 3, 1968, Marlboro Improvement applied to the Marlboro Planning Board for a classification of its proposed subdivision. The details of the subdivision were set forth on the sketch plat it submitted with its application. On December 23, 1968, the application was classified as a "major" subdivision (since the property would eventually be developed residentially).

The subdivision plan which was submitted to the planning board proposed a division of the entire tract, with the exception of a 15-acre portion, into three-quarter-acre residential lots. The 15-acre portion was reserved for a shopping center, since that portion of the tract had already been zoned commercially under the town's zoning ordinance.[6]

Subsequently, there were a series of informal meetings or work sessions with the planning board. At these meetings, which were attended by Traphagen and one of Marlboro Improvement's engineers, the proposed subdivision plan was analyzed and the board would recommend various engineering changes to the sketch plats.

The final workshop meeting occurred sometime in the early part of July 1969, about 1 week before Marlboro's application for preliminary approval was to be formally heard. At this meeting, the planning board informally agreed to approve Marlboro's subdivision. Consequently, Traphagen and the other petitioners anticipated that the planning board would automatically vote in favor of approving Marlboro Improvement's subdivision plan at the formal application hearing.

The next week at the regular planning board meeting, the expectations for routine approval were not realized. The planning board proposed a resolution that the township of Marlboro amend its zoning ordinance to provide for 2-acre residential zoning for the entire town.[7] Pursuant to this proposed amend-

---

[6]Mr. Hayes was able to farm this land since he was paying taxes to maintain an agricultural assessment.

[7]There is a conflict between the testimony given and one of the documents submitted insofar as the minimum acre requirement of the proposed amendment is concerned. Although such has

ment, every residential lot would have to consist of a minimum of 2 acres. The planning board failed to act on Marlboro Improvement's application and deferred consideration thereon until its next regular meeting.

On or about July 14, 1969, the Marlboro Township Council abided by the planning board's proposal and adopted an ordinance, effective August 18, 1969, changing the town's residential zoning requirements to 2 acres.

After the amendment was passed, the planning board conducted its next meeting. The corporation's subdivision application was routinely denied since it no longer conformed with the town's zoning requirements.

The petitioners were quite upset over the planning board's change of heart and the new zoning ordinance; the planning board's recommendation for a zoning amendment had taken them totally by surprise. Up until that time, the board members had consistently conveyed the impression, through a series of informal representations, that Marlboro Improvement's subdivision plan would be approved without any difficulty. A significant amount of time and money, particularly with respect to the sketch plat of the proposed subdivision, had gone into the preparation of their subdivision application. These maps were now rendered useless by the town's new zoning requirements. In order to comply with the new ordinance, more money would now have to be spent for the drafting of new sketch maps.

Submission of a conforming subdivision plan was not, however, viewed as a viable alternative since a residential tract with larger lot sizes was not considered readily salable. Petitioners felt that they had no option other than to seek legal redress for their grievances. As a result, litigation ensued between Marlboro Improvement and the town over the zoning amendment. Finally, in April of 1972, Marlboro Improvement and the town agreed to a settlement. Pursuant to this settlement (as evidenced by a consent judgment), Marlboro Improvement was granted the right to file and obtain approval for a subdivision plan based on half-acre zoning (the town had recently amended its zoning ordinance in contemplation of the settlement). Every building

---

no bearing on the outcome of this case, we accept for purposes of discussion the testimony that the proposed amendment would change Marlboro's residential zoning requirements to a minimum of 2 acres.

lot was required to consist of at least one-half acre. In addition, Marlboro Improvement agreed to dedicate 70 acres to the town; a 15-acre portion of the tract was to retain its commercial zoning.

Marlboro Improvement subsequently applied to the Marlboro Planning Board for approval of its revised sketch plat. The subdivision map consisted of 79 half-acre residential lots, a 15-acre area for future development as a shopping center, and a 70.6-acre residual area to be dedicated to the town. The subdivision application was given final approval on November 9, 1972, in a resolution by the Marlboro Township Council.

The portion of the property which had been subdivided into 79 half-acre lots was sold to Fairfield Manor, Inc. (Fairfield). Fairfield, a development company, had learned that Marlboro Improvement was in the process of making its revised subdivision application. A Fairfield developer had spoken to Mrs. Traphagen one day while paying a water bill and she informed him about the property which Marlboro Improvement held.

A contract to sell the property to Fairfield was executed on November 3, 1972. The 79-lot tract was deeded to Fairfield on January 25, 1973, for a total purchase price of $513,500.

The 130-acre tract acquired from Hayes in 1968 is the only property Marlboro Improvement has ever owned. With respect to the 79-lot portion sold to Fairfield, the corporation did not engage in any advertising, solicitation, sales promotion, or other marketing techniques. The only other realty transactions which Marlboro Improvement had any involvement with were a condemnation by the State of New Jersey of a 2½-acre portion and the subsequent sale of the remaining 15-acre shopping center lot.

During this same approximate time period, the corporation was involved in negotiations over a condemnation award. The State of New Jersey had condemned 2½ acres of the tract in order that a new State highway, Route 18, could be constructed. The proposed highway cut through the lower portion of the tract and would isolate about 5 acres. Eventually, in 1972, the State of New Jersey paid Marlboro Improvement $29,000 for the 2½ acres it condemned.[8]

---

[8]Most of this award was paid to Hayes since Marlboro Improvement was in arrears on its first principal payment ($25,000).

The 15-acre lot had originally been zoned commercially for future development as a shopping center. After the sale to Fairfield, this was the only land Marlboro Improvement held. The town, however, had second thoughts about permitting the development of the 15-acre lot into a shopping center. As a result, Marlboro Improvement applied for a zoning variance on June 15, 1976. The planning board, on November 3, 1976, approved the application by Marlboro Improvement for a zoning variance and allowed it to obtain residential zoning for the 15 acres. That portion was subsequently subdivided into 30 residential lots and sold.[9]

During the period from the acquisition of Hayes's property until the eventual sale to Fairfield, Marlboro Improvement incurred various expenses totaling over $100,000. In addition to the engineering fees, there was a $3,000 fee incurred in connection with the subdivision application. A major portion of the expenses Marlboro Improvement paid was attributable to interest and local taxes, which petitioner Ben Roberts, Marlboro Improvement's accountant, estimated at $5,000 per quarter during the period Marlboro Improvement held the property.

During the period from acquisition until sale, the value of raw land in the vicinity of Marlboro Township increased at a rate of 5 to 10 percent per year.

The petitioners in this case have varying backgrounds, with some of them having previously engaged in real estate activities. Traphagen, between 1967 and 1973, was employed for over 30 years as a tool and die maker. He has been a resident of Marlboro Township for over 12 years and at the time of the trial of this case was Deputy County Clerk of Monmouth County.

Prior to his residence in Marlboro, Traphagen lived in Matawan Township, where he held the public offices of township committeeman and mayor. In addition, he had also been a member of Matawan's planning board, library commission, and chairman of its utilities authority. His familiarity with zoning procedures was derived from his service as a member of the Matawan Planning Board. At one time, he was involved in selling residences and he still maintains a saleman's license.

---

[9]The record does not indicate when either of these events occurred.

However, the last commission he derived from selling a home was approximately 10 years ago in 1970.

John Fiorino is a licensed real estate and insurance broker and an appraiser of residential land. He is the owner of Van's Agency, a real estate agency where Traphagen was once employed for a short time. The business premises of Van's Agency were used for conducting Marlboro Improvement's affairs. From approximately 1961 to 1965, Fiorino served as a member of the Matawan Planning Board.

Francis Miller is an industrial real estate broker involved in the sale and leasing of factories, warehouses, office space, and industrial land. He first learned of the property from Fiorino, whom he had known since 1960. In the 1960's, Miller was a partner with Fiorino in Van's Agency. Most of their business involved the resale of residential homes in Matawan, N.J. Miller left Van's Agency in 1969. He never had any previous involvement in a residential real estate venture.

Ben Roberts is a certified public accountant who learned of this venture from Traphagen. He was treasurer of Marlboro Improvement and was responsible for the corporation's books and records, including its tax returns.

George V. Buono is a school principal and has been so employed since 1961. He first learned of Hayes's tract from Fiorino.

Thomas F. Kane is in the securities business. Miller first informed him of the property. He sold his interest in the corporation after the property was sold to Fiorino and Traphagen in 1973.

With the exception of Traphagen and Fiorino, all of the petitioners were passive investors in the transaction. Each contributed their proportionate initial capital outlay and made such additional contributions as were necessary. Traphagen and Fiorino were actively involved in Marlboro Improvement's affairs, particularly with respect to obtaining subdivision approval and the lawsuit with the town. As a consequence, after the sale to Fairfield, the corporation voted them $25,675 for services they rendered on its behalf.

## OPINION

This Court has previously held that "There is nothing unique or improper about a corporation engaging in exclusively invest-

ment activity," including under this rubric a subchapter S corporation. *Howell v. Commissioner*, 57 T.C. 546, 553 (1972). We make this observation at the outset, notwithstanding the fact that neither party has argued the point or indeed even brought the *Howell* case to the attention of the Court, because it has been black letter law ever since *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943), that a corporation is, almost by definition, an entity engaged in "business activity." Without *Howell*, one might have erroneously assumed that a corporation's inherent nature foreclosed any further inquiry into the question before us.

Briefly, the facts in *Howell* were as follows: Three individuals decided to acquire property as an investment. They formed a subchapter S corporation in 1961 and caused it to buy the land. The corporation had no other assets and received no income from the property. In 1964, 1965, and 1966, the corporation sold the property in three transactions, with the first two being merely incidental to the final sale which disposed of over 90 percent of the tract. On the foregoing facts, we held that the fact that the corporation's only activity was the sale of the land did not cause the proceeds therefrom to be ordinary income when said property was not held primarily for sale in the ordinary course of its trade or business, but rather was acquired as an investment. We also held that the corporation did not thereby lose its subchapter S qualification and that the shareholders were entitled to treat distributions from the corporation resulting from the sales as long-term capital gains.[10]

We found as a fact in *Howell* that the corporation "at no time subdivided the tract," notwithstanding the fact that the corporation sold off three separate parcels. This is apparently permissible in Georgia although it would not be in New Jersey, where the tract sub judice is located. N.J. Stat. Ann. secs. 40:55–1.2, 40:55–

---

[10]In Rev. Rul. 75–188, 1975–1 C.B. 276, the Commissioner ruled that a corporation that did not operate an active trade or business, but was merely a passive investor receiving only capital gains from its sale of unimproved real estate, did not have "passive investment income" and therefore remained qualified as a subch. S corporation, relying on our decision in *Howell* for this conclusion.

1.18, 40:55–1.23 (West 1967) (repealed 1975; current version at secs. 40:55D–37, 40:55D–54, 40:55D–55 (West Supp. 1979)).[11]

In the case before us, petitioners are, in effect, asking us to go one step beyond *Howell*, where the corporation remained an investor vis-a-vis dealer when it merely disposed, in a single sale, of most of its empty land. We are here asked to confirm capital gains treatment to Marlboro Improvement where it disposed, in a single sale, of most of its empty land, but only after obtaining subdivision approval for half-acre building lots.

Respondent's first argument for denying capital gain treatment is based on the contention that the property Marlboro Improvement sold to Fairfield was "property held by the taxpayer primarily for sale to customers in the ordinary course of [its] trade or business." (Sec. 1221(1).) In this regard, respondent asserts that the corporation was in the business of packaging a product, i.e., subdivided property, for sale to builders of residential homes. According to the respondent, the gain from the sale of this "package" is primarily due to the activities which Marlboro Improvement undertook in obtaining approval of its subdivision application and not to market appreciation accruing over a substantial period of time. In such a case, respondent maintains that any gains must be treated as ordinary income since the policies underlying the capital gain provisions are lacking.[12]

Petitioners, on the other hand, argue that the Hayes's tract was acquired and has consistently been held solely for investment purposes and that Marlboro Improvement was never in the business of selling real estate. Petitioners urge that ordinary income treatment should not result since the property was merely subdivided (i.e., approved by the township of Marlboro to be sold in separate lots) and sold intact. Given the presence of

---

[11]In other words, it would have been necessary for Marlboro Improvement, the subch. S corporation in the case before us, to have obtained some subdivision approval before doing what the *Howell* subch. S corporation did.

[12]See, e.g., *Malat v. Riddell*, 383 U.S. 569, 572 (1966), where the Supreme Court commented about sec. 1221(1) as follows:

"The purpose of the statutory provision with which we deal is to differentiate between the 'profits and losses arising from everyday operation of a business' on the one hand (*Corn Products Refining Co. v. Commissioner*, 350 U.S. 46, 52), and 'the realization of appreciation in value accrued over a substantial period of time' on the other. (*Commissioner v. Gillette Motor Transport, Inc.*, 364 U.S. 130, 134.)"

only a single conveyance, petitioners claim that Marlboro Improvement's activities lack sufficient continuity and frequency to constitute a trade or business under section 1221(1). In other words, merely obtaining approval for a subdivision plan cannot, in the case of an isolated sale of a single piece of land, constitute a business which a subsequent sale would be in the ordinary course thereof.

Many courts, including this one, have relied on a group of certain key factors to determine whether property is excluded from the section 1221 capital asset definition. Although we are mindful that specific factors or their combination are not necessarily controlling, resort to these classic factors provides us at least with a starting point for our analysis.[13] For example, in determining whether property is held primarily for sale to customers in the ordinary course of business, the following factors have been considered: The nature and purpose of the acquisition of the property and the duration of the ownership; the extent and nature of the taxpayer's efforts to sell the property; the number, extent, continuity, and substantiality of the sales; the extent of subdividing, developing, and advertising to increase sales; the use of a business office for the sale of the property; the character and degree of supervision or control exercised by the taxpayer over the representative selling the property; and the time and effort the taxpayer habitually devoted to the sale. *United States v. Winthrop*, 417 F.2d 905, 910 (5th Cir. 1969); *Kaltreider v. Commissioner*, 255 F.2d 833 (3d Cir. 1958), affg. 28 T.C. 121 (1957); *Howell v. Commissioner, supra.*

Here, there is little dispute concerning Marlboro Improvement's purpose for acquiring Hayes's tract. The petitioners testified that they intended to hold the property for approximately 1½ years and then resell it at a profit. It is evident that petitioners intended ab initio to resell the property as soon as the subdivision plan had been approved. But even though Marlboro Improvement may have held the property at all times for sale to customers, our analysis cannot end here. Satisfying the "held for sale to customers" requirement of section 1221(1) does not resolve the issue at hand. We must also determine whether

---

[13]It is readily apparent that any one case can be sui generis since its particular outcome may result from its own peculiar facts. See *Thompson v. Commissioner*, 322 F.2d 122, 127 (5th Cir. 1963), affg. in part and revg. in part 38 T.C. 153 (1962).

Marlboro Improvement's activities constituted a trade or business since the sale to Fairfield must have been made in the ordinary course thereof. *United States v. Winthrop, supra* at 911; *Bynum v. Commissioner*, 46 T.C. 295, 302 (1966) (concurring opinion by Judge Tannenwald).

We are convinced that Marlboro Improvement did not hold the tract "for sale to customers in the ordinary course of a trade or business" for purposes of section 1221(1). As we held in *Howell v. Commissioner, supra* at 555, even though the property may have been acquired with the ultimate intention of reselling, this does not result in a determination that the property was held primarily for sale in the ordinary course of business.

Our determination here is based on considerations which relate primarily to a lack of frequent and substantial sales activity. In the context of this case, we consider the lack of frequent sales to be the most important *objective* factor for purposes of characterizing the gain petitioners received. *Biedenharn Realty Co. v. United States*, 526 F.2d 409 (5th Cir. 1976);[14] *Gamble v. Commissioner*, 68 T.C. 800, 812 (1977).

All of the evidence demonstrates the isolated nature of the transaction. Hayes's tract has been the only property Marlboro Improvement acquired. Related to this is a lack of improvements, construction, or sale of the tract in individual lots. The solitary nature of the acquisition and the single sale to Fairfield, by definition, precludes a finding that Marlboro Improvement was engaged in substantial and frequent real estate sales over an extended period of time.[15] The only other dispositions of property consisted of the condemnation by New Jersey for Route 18 and the subsequent sale of the shopping center portion after the township of Marlboro retreated from its plan to permit the development of that area commercially. Both of these dispositions, which resulted solely from the mandates of State and local governments, were essentially involuntary and do not add anything of significance for purposes of analyzing the frequency and substantiality of Marlboro Improvement's sales.

---

[14]The Fifth Circuit has recently emphasized in *Suburban Realty Co. v. United States*, 615 F.2d 171, 178 (5th Cir. 1980), that the frequency and substantiality of sales is the most important factor for determining whether the taxpayer is engaged in the real estate business.

[15]Compare *Thomas v. Commissioner*, 254 F.2d 233, 237 (5th Cir. 1958) with *Biedenharn Realty Co. v. United States*, 526 F.2d 409, 416 (5th Cir. 1976).

In our view, Marlboro Improvement's efforts in obtaining subdivision approval and selling the major parcel as a single tract, coupled with two separate dispositions of the highway and shopping center parcels, do not put the corporation in a trade or business. Admittedly, subdivision of the tract into half-acre building lots takes us in the direction of the indistinct line of demarcation between investment and dealership. It may confidently be expected that eventually another case will present us with a fact situation where the taxpayer not only subdivides, but also physically lays out streets and puts in utilities before disposing of the tract in one single transaction. That decision, of course, is for another day.[16]

But here the petitioners have merely enhanced the property by taking purely legal steps to make it more marketable. In a State as densely populated as New Jersey, with 517 separately incorporated municipalities—each jealous of its own prerogatives—a successfully achieved major subdivision is no mean feat. This fact petitioners established beyond peradventure of a doubt at the trial of this case.

The *crucial* fact, which we believe petitioners have established by wholly convincing evidence, is that their *intention* was at all times to sell the unimproved property as a single tract. The major subdivision which they were reluctantly required to undertake—and successfully accomplished after encountering massive aggravating obstacles—placed the gloss on the tract which made it salable.

As the Third Circuit (the court to which this case would be appealed) has held in *Jersey Land & Development Corp. v. United States*, 539 F.2d 311 (3d Cir. 1976), the ultimate issue in a dealer versus investor case is "a taxpayer's motivation in holding a particular piece of property." We have found that petitioners' intention was at all times to sell the unimproved property as a single tract, and in our view this puts Marlboro Improvement in the investor category.

We are not unmindful that the Third Circuit found ordinary income rather than capital gain in *Jersey Land & Development*

---

[16]The Sixth Circuit recently upheld a District Court determination that sales proceeds were taxable as capital gain in a case where the property was subdivided, improved by the addition of gravel roads, *and* disposed of in lots (in a 17-year period, 87 lots were disposed of in 45 separate sales). *Gartrell v. United States*, 619 F.2d 1150 (6th Cir. 1980).

*Corp. v. United States, supra.* Nevertheless, we believe the facts in the case before us to be sufficiently different to justify a result different from that in *Jersey Land & Development Corp. v. United States, supra.* In that case, the taxpayer corporation was a sister corporation of a trucking company which required expanded facilities. Taxpayer entered into a lease-option agreement with the township of North Bergen, N.J., covering approximately 97 acres of marshland in the township. Taxpayer's option was contingent upon its filling and grading the tract. Taxpayer was required to fill and grade at least 25 acres during the first year of the lease and at least 10 acres in each subsequent year. Upon completion of the filling and grading of any 5-acre segment, taxpayer could exercise its option to purchase that segment.

About halfway through the lease term, the trucking company was sold to an unrelated business, but the taxpayer continued grading, filling, and acquiring segments of the land. Significantly, shortly after the trucking company was sold, the taxpayer commenced selling segments of the unimproved land, and within 7 years it had sold approximately 40 of its 75 acres at a considerable profit in six separate transactions. Finally, the Circuit Court found it extremely significant that a number of the trucking company's other corporations acquired, improved, and resold marshland properties during the same general time frame as Jersey Land so operated. The court, accordingly, concluded that the taxpayer's acquisition, improvement, and sale of the property, which was part of a pattern of similar activities carried on by associated corporations, established that the taxpayer held the tract primarily for sale in the ordinary course of its business, resulting in ordinary income rather than capital gain.

Some of the facts that distinguish the case before us from those in *Jersey Land* are: Marlboro Improvement *acquired* the tract in a single transaction, rather than piecemeal over an extended period—a fact connoting commercial activity; Marlboro Improvement did nothing comparable to grading and filling by way of improvement; in fact, it made *no* improvements notwithstanding respondent's efforts to characterize subdivision as an "improvement," a concept not generally recognized in the real estate world; the subdivision became a necessity by reason of the exigencies of the real estate market as they existed in

1973 and the years immediately preceding, whereas the grading and filling by Jersey Land, at least after its trucking company sibling was sold, was entirely voluntary and part of a continuing program to improve the land and, as the Circuit Court concluded, to market the land piecemeal; Marlboro Improvement was in no way related to any other corporation and was by no stretch of the imagination part of a pattern of business activities carried on by associated corporations.

Thus, while questions in the dealer-investor area are rarely wholly free from doubt, we believe petitioners' facts are distinguishable from those of *Jersey Land.* There is simply lacking here the continuing commercial activity which tainted the taxpayer's claim of investment for capital gains in *Jersey Land & Development.*

In view of the fact that Marlboro Improvement's activities do not fall within the general fact pattern of cases which have found ordinary income—i.e., subdivision in conjunction with improvements and lot sales[17] —respondent argues that the activities in connection with obtaining approval for the subdivision plan, alone, constitute a trade or business for purposes of section 1221(1). Respondent's position is that the factors which courts have traditionally utilized in this area are only useful in determining whether a taxpayer is a "dealer" in real estate and that the concept of a trade or business in section 1221(1) is broader and not necessarily synonymous with the word "dealer."[18]

To buttress this argument, respondent has directed our attention to several cases that have discussed the role which nonmarket appreciation plays in determining the character of gain on the sale of property.[19] Respondent indicates that any appreciation of the property could not have exceeded 10 percent

---

[17]E.g., *McManus v. Commissioner,* 583 F.2d 443 (9th Cir. 1978), affg. 65 T.C. 197 (1975); *Gault v. Commissioner,* 332 F.2d 94 (2d Cir. 1964), affg. a Memorandum Opinion of this Court; *Kaltreider v. Commissioner,* 255 F.2d 833 (3d Cir. 1958), affg. 28 T.C. 121 (1957).

[18]For a discussion regarding dealers, see *Kemon v. Commissioner,* 16 T.C. 1026, 1032–1033 (1951).

[19]*Kemon v. Commissioner,* 16 T.C. 1026 (1951); *Bynum v. Commissioner,* 46 T.C. 295 (1966); *Jersey Land & Development Corp. v. United States,* 539 F.2d 311 (3d Cir. 1976).

for any one year during Marlboro Improvement's holding period.[20] Accordingly, respondent contends the bulk of the gain realized on the sale to Fairfield is attributable to Marlboro Improvement's obtaining approval for its subdivision plan and thus urges that capital gain treatment should be denied since the property's appreciation did not accrue over a substantial period of time, citing *Commissioner v. Gillette Motor Co.*, 364 U.S. 130 (1960). The underlying premise of this argument is that any activity of the taxpayer which gives rise to substantial appreciation must be deemed a trade or business under section 1221(1).

The Fifth Circuit in *United States v. Winthrop*, 417 F.2d at 909, refused to adopt a per se rule denying capital gain treatment whenever the "efforts" of the taxpayer resulted in the property's appreciation. In rejecting what it perceived as an overly broad interpretation of the *Corn Products*[21] doctrine, the court stated:

Indeed, the cases are many where taxpayer efforts have contributed to value and have been accorded capital gains treatment. * * * We therefore conclude that this blanket interdiction of capital gains treatment where there has been any laying on of hands is belied by the past decisions of this court.[22]

Petitioners, through Marlboro Improvement, merely subdivided the land in order to make it more marketable and enhance its value.[23] Indeed, many cases have allowed capital gains treatment for taxpayers who subdivided their property even though improvements were made thereto and even though sales were effected by numerous dispositions of individual lots. See, e.g., *Estate of Barrios v. Commissioner*, 265 F.2d 517 (5th Cir. 1959); *Curtis Co. v. Commissioner*, 232 F.2d 167 (3d Cir. 1956); *Gartrell v. United States*, 619 F.2d 1150 (6th Cir. 1980).

The cases which respondent has cited as authority for a blanket "taxpayer efforts" rule fail to lend support for such a proposition.[24] Although the appreciation at issue in each of the

---

[20]This is based on the testimony of John Brody, a real estate appraiser familiar with property located in the Marlboro area. He estimated that during the late 1960's and early 1970's, the real estate in Marlboro Township increased in value between 5 and 10 percent each year.

[21]*Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955).

[22]The *Winthrop* court ultimately held for the Commissioner, but on different grounds.

[23]See *Temple v. United States*, 229 F. Supp. 687, 692–693 (S.D. Miss. 1964), affd. 355 F.2d 67 (5th Cir. 1966).

[24]See the cases cited in n. 17 *supra.*

cases was attributable mainly to the efforts of the taxpayer, such a factor supported a finding that the substantiality and frequency of the activities in question were sufficient to put the taxpayer in the real estate business. In other words, the fact that a taxpayer's activities contributed to the property's appreciation did not acquire significance independent of the question whether these activities constituted a trade or business under section 1221(1). That question should not be resolved by examining only whether the property's appreciation is due mainly to the taxpayer's efforts. Rather, the focus of the inquiry is whether the taxpayer's activities rise to the level of a trade or business.[25]

In an area of the tax law which is essentially factual, we cannot adhere to a blanket rule that any activity which results in appreciation necessarily constitutes a section 1221(1) business. Accordingly, we conclude that Marlboro Improvement did not hold the portion of land sold to Fairfield as property to be sold to customers in the ordinary course of a trade or business under section 1221(1).

We now turn to the respondent's second argument for taxing petitioners' sales proceeds as ordinary income. Respondent argues that petitioners are not entitled to report the income from the sale to Fairfield as capital gain because of the provisions of section 1.1375–1(d), Income Tax Regs., which reads in part as follows:

(d) *Level for determining character of gain.* Ordinarily, for purposes of determining whether gain on the sale or exchange of an asset by an electing small business corporation is capital gain, the character of the asset is determined at the corporate level. However, if an electing small business corporation is availed of by any shareholder or group of shareholders owning a substantial portion of the stock of such corporation for the purpose of selling property which in the hands of such shareholder or shareholders would not have been an asset, gain from the sale which would be capital gain, then the gain on the sale of such property by the corporation shall not be treated as a capital gain. * * *

Respondent points out that three of Marlboro Improvement's shareholders, Miller, Traphagen, and Fiorino, engaged in real estate activities and possessed sales licenses. Respondent main-

[25]The fact that a substantial amount of appreciation is due to the taxpayer's activities is, of course, a significant factor to consider in making this determination. However, such does not, standing alone, *necessarily* require a finding that the taxpayer's property is excluded from the capital asset definition by sec. 1221(1).

tains that the subject property would not be a capital asset in their hands by virtue of such activities. Since they owned 55 percent of the stock of Marlboro Improvement, admittedly a substantial portion, respondent concludes that, under the regulation, Marlboro Improvement's sale of the property cannot be treated as capital gain.

The flaw in respondent's argument is his assertion that the property would not have been a capital asset in the hands of any of the three shareholders. On the basis of the facts presented, we find that the property would have been a capital asset in the hands of any of Miller, Traphagen, or Fiorino.

Fiorino presents the most likely choice for dealer status: he is a licensed real estate broker and appraiser of residential realty. However, the fact that a taxpayer is a broker does not require a determination that he is in the business of buying and selling real estate for his own account (in other words, a dealer). *Howell v. Commissioner, supra.*

A broker is, in effect, a middleman or go-between who brings buyers and sellers together and who receives compensation for such efforts in the form of commissions. Brokerage activities necessarily relate to property owned by others. *Thomas v. Commissioner,* 254 F.2d 233, 236–237 (5th Cir. 1958). The activities of a dealer, on the other hand, more closely resemble those performed by a merchant or retailer of goods. A dealer is a person who buys and sells property as stock in trade for his *own* account. *Thomas v. Commissioner, supra.*

Although a taxpayer can be both a broker and a dealer, *Tomlinson v. Dwelle,* 318 F.2d 60 (5th Cir. 1963), the two terms are not synonymous. Thus, it is clear that Fiorino's brokerage activities do not mandate a finding that Marlboro Improvement should be accorded dealer status.

In the instant case, there is no evidence that Fiorino bought and sold property on his own account and in such an extensive manner as to constitute a separate business as a dealer. It is also clear that the property would have been a capital asset in the hands of both Miller and Traphagen. Miller merely possessed a broker's license and, moreover, his real estate activities involved a different genre, namely, industrial real estate. Traphagen's connection with the real estate business was attenuated at best: he possessed a broker's license and his last sale occurred approximately in 1970.

As regulation sec. 1.1375–1(d) itself indicates, the character of an asset is normally determined at the corporate level. Moreover, as we have already noted, corporations are almost universally accorded recognition as separate viable entities under the tax law. *Moline Properties, Inc. v. Commissioner, supra.* We simply do not perceive the case at hand to be the type of abuse situation which respondent's regulation was intended to ameliorate.[26] Since we consider the regulation inapplicable here, we expressly leave open the question of its validity.[27] See *Howell v. Commissioner, supra* at 557.

Accordingly, we hold that petitioners were entitled to report the income from the tract sale as capital gain.

*Decision will be entered under Rule 155.*

---

[26]We note that in the partnership area there is substantial doubt as to whether the dealer status of a partner will taint the partnership on a sale of property. See discussion in W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, par. 9.05[1], [2], pp. 9–19, 9–23.

[27]It has been suggested that the validity of the regulation may be open to question, especially in view of the contemporaneous enactment of the shareholder characterization rules for collapsible corporations in sec. 341(e). See B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 6.06, pp. 6–26 and n. 58 (4th ed. 1979).