ROBERT ERFURTH AND JUDITH ERFURTH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; HENRY ERFURTH AND EVELYN ERFURTH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Erfurth v. Commissioner
Docket Nos. 10549-81, 10550-81.
United States Tax Court
T.C. Memo 1987-232; 1987 Tax Ct. Memo LEXIS 232; 53 T.C.M. (CCH) 767; T.C.M. (RIA) 87232; May 5, 1987. James F. Campion, for the petitioners. Judith M. Picken, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: In these consolidated cases, respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: [1]Section 6654 Docket No.
Petitioners
Year
Deficiency
Additions
10549-81
Robert and Judith
1976
$814.33
Erfurth
1977
34,064.61
1978
26,401.54
10550-81
Henry and
1976
25,397.60
1,036.18
Evelyn Erfurth
1977
84,853.59
2,982.40
1978
14,889.41
1,573.66
*234 The issues for decision are: (1) Whether petitioners, after converting the Golf View apartment complex into condominiums, held these condominium units primarily for sale to customers in the ordinary course of their trade or business, thereby prohibiting capital gains treatment on their sale; (2) Whether the purchaser of the Colonial View apartment complex assumed the mortgage on the property or took the property subject to the mortgage within the meaning of section 453 and the regulations thereunder; and (3) Whether petitioners are entitled to deduct in 1976 expenses consisting of appraisal and recording fees and loan costs totaling $22,376.13 incurred in connection with the purchase and sale of the Colonial View apartment complex. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, the first supplemental stipulation of facts, the second supplemental stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Robert Erfurth and Judith Erfurth, husband and wife, resided in Burr Ridge, Illinois, at the time their petition was filed in this case. They timely filed their joint *235 Federal income tax returns (Forms 1040) for 1976, 1977, and 1978 with the Internal Revenue Service Center in Kansas City, Missouri. Petitioner Judith Erfurth is a party in this case solely because she filed a joint tax return with her husband for the years in issue. Petitioners Henry Erfurth and Evelyn Erfurth, husband and wife, resided in Westchester, Illinois, at the time their petition was filed in this case. They timely filed their joint Federal income tax returns (Forms 1040) for 1976, 1977, and 1978 with the Internal Revenue Service Center in Kansas City, Missouri. Petitioner Evelyn Erfurth is a party in this case solely because she filed a joint return with her husband for the years in issue. I. Background
From 1953 until 1960 Henry Erfurth together with various partners constructed residences for sale. From January 1, 1961 through 1978 and continuing to the present, Henry Erfurth has been engaged in a partnership with his brother, Robert Erfurth, in a real estate business operating under the name Lyn Jay Realty. During 1976, 1977, and 1978, Lyn Jay Realty operated out of an office located in Lyons, Illinois. Lyn Jay Realty timely filed partnership returns (Forms *236 1065) for 1976, 1977, and 1978 with the Internal Revenue Service Center in Kansas City, Missouri. The deficiencies in petitioners' Federal income tax determined by respondent relate to adjustments made at the partnership level. Unless otherwise indicated, all references to petitioners are to Henry and/or Robert Erfurth acting as partners of Lyn Jay Realty. In 1961 petitioners constructed three buildings, each with 12 rental apartment units, in Antioch, Illinois. In 1963 or 1964, petitioners constructed six 12-unit rental apartment buildings and one 6-unit rental apartment building in Lyons, Illinois. In 1966 petitioners sold one of the 12-unit buildings located in Lyons. Also in 1966, Henry Erfurth and Lewis Pranno began construction of a 312-unit rental apartment complex near Des Plaines, Illinois. Construction of this complex was completed in 1969. In 1967 and 1968, petitioners constructed five more 12-unit rental apartment buildings, three in Lyons and two in Antioch, Illinois. Also in 1968, petitioners sold one of the six 12-unit buildings constructed in 1963 and 1964 in Lyons. By 1969 Henry Erfurth had an interest in 462 rental apartment units. On June 30, 1971, Henry *237 Erfurth and Lewis Pranno sold the 312-unit apartment complex near Des Plaines. [2] Also in 1971, petitioners bought a vacant lot in Lyons and constructed a 12-unit rental apartment building on it. By 1972 petitioners were managing and operating rental property consisting of 13 12-unit apartment buildings and one 6-unit apartment building in Illinois. In 1973 petitioners sold the 6-unit apartment building located in Lyons. In 1974 Henry Erfurth sold four buildings housing 10 stores located in Bellwood, Illinois. [3] On October 31, 1976, petitioners sold a 4-unit apartment building located in Maywood, Illinois. This property had been acquired in 1961. In 1978 petitioners sold six acres of undeveloped land in Delavan, Wisconsin, which land had been purchased in 1973. Thus, since 1961, petitioners' real estate business consisted *238 of constructing and operating rental properties. Occasionally they sold an apartment building, usually after operating it as rental property for several years. These occasional sales were always outright sales of the property. Petitioners had never converted any of their apartment buildings to condominiums until 1976, when the economic exigencies detailed below forced them to convert the Golf View Apartments to condominiums in order to dispose of the property to avoid foreclosure. II. Golf View Apartments
In 1972 petitioners acquired undeveloped land in Lake Geneva, Wisconsin. The Golf View and Colonial View (which will be discussed below) Apartments were petitioners' first projects in Wisconsin, but that area also drew from Chicago and the Chicago suburbs as did their Illinois projects. On September 26, 1972, petitioners filed an Application for Loan Placement (Income Property) with the American City Bank & Trust Company (American City Bank), Milwaukee, Wisconsin, to obtain construction financing for a 72-unit apartment complex on a portion of the Lake Geneva property. By letter dated December 27, 1972, American City Bank agreed to commit to provide and lend construction *239 financing to petitioners in the amount of $1,100,000 for 15 months at 3.25 percent over prime ("construction financing"). By separate letter on the same date, American City Bank also agreed to commit to make a first mortgage loan on real estate in the amount of $1,100,000 for 25 years at 8.5 percent ("permanent financing" or "end loan"). The mortgage loan closing date for the permanent financing was set for April 1, 1974. The closing date of the mortgage loan is the date when the interim construction loan is retired using the proceeds of the long-term mortgage, i.e., the construction financing is paid off by the permanent financing, and the permanent financing is secured by a mortgage on the newly constructed apartment building. Petitioners subsequently requested that the commitments for interim and long-term financing be modified to allow them to construct an additional four units, making the project a 76-unit complex. Petitioners also requested the interim and long-term loans be increased $62,000 for these extra four units. American City Bank agreed to these requests and granted petitioners the construction loan and mortgage on April 9, 1973, in the amount of $1,162,000. Also *240 on April 9, 1973, American City Bank granted petitioners' request to extend the closing date of the long-term mortgage loan from April 1, 1974 to October 1, 1974. By June of 1974, construction of Golf View Apartments was completed except for sodding the grounds, and that was accomplished in July 1974. Petitioners began renting apartments immediately upon completion. During June of 1974, Norman Kroening, the independent mortgage broker who acted for petitioners in securing the Golf View financing, met with a representative of American City Bank to discuss the status of the construction and mortgage loans. Various matters were discussed, including extending the construction loan, decreasing the interest rate on the construction loan (from 12 to 9 percent) during the extended period, increasing the interest rate of the long-term loan (permanent financing) from 8.5 to 9 percent, and extending the term of the permanent financing from 25 to 30 years. Petitioners had not requested these changes. American City Bank wanted more time to try to obtain participation by other financial institutions in the permanent financing, i.e., to try to sell the permanent loan. Petitioners agreed only *241 to the extension of time requested by American City Bank. Thus, by mutual agreement on August 27, 1974, American City Bank and petitioners extended the closing date of the long-term mortgage loan from October 1, 1974 to December 3, 1974, with interest on the construction loan reduced to 8.5 percent for that period, the same rate as on the long-term mortgage. The terms of the long-term mortgage loan agreement remained unchanged. On December 6, 1974, petitioners were ready to close and met with American City Bank's counsel. However, again at the request of American City Bank, petitioners and the bank entered into an agreement to further extend the closing date to a date not sooner than November 15, 1975, nor later than December 1, 1975. The interim construction loan due date was also extended to December 1, 1975, with the interest retained at 8.5 percent. Apparently, American City Bank had participated the construction loan with several other lending institutions and did not have funds readily available to pay off those lenders and also put petitioners' long-term mortgage into effect. Meanwhile, petitioners had completed construction of the 76-unit complex in June of 1974 and *242 had rented two-thirds of the apartments by December of 1974. The 76-unit complex was known as Golf View Apartments. Golf View was built for use as rental property, with a single gas meter, one central heating plant, and one central hot water tank. In October of 1975, American City Bank again approached petitioners requesting an extension on the closing date on the permanent mortgage to February of 1976, and indicating that it still had not "sold the loan." Four days later petitioners were informally advised that the Federal Deposit Insurance Corporation (FDIC) had declared American City Bank insolvent, that FDIC did not intend to honor the agreement for permanent financing, and that if petitioners did not pay off the construction loan, FDIC would foreclose on Golf View Apartments. [4]
By letter dated November 26, 1975, James P. Hudson, *243 the FDIC Liquidator, gave petitioners formal notice of the insolvency of American City Bank, the appointment of FDIC as Receiver to liquidate the business of the bank, and the disaffirmance effective October 21, 1975, of the permanent loan commitment executed December 27, 1972. Also on November 26, 1975, petitioners notified American City Bank that they were ready to close on the permanent loan on December 1, 1975, and that the proceeds from the long-term loan would be used to pay the construction loan due on December 1, 1975. Thereafter, despite petitioners' pleadings, the FDIC demanded immediate payment of the construction loan, increased the interest rate on the construction loan from 8.5 percent to 12 percent, and threatened foreclosure on the property if the loan was not paid. Petitioners then had Norman F. Kroening, the independent mortgage broker who had previously secured petitioners' long-term financing for both the Golf View and Colonial View apartment complexes, try to secure a long-term mortgage to replace the one being disaffirmed by the FDIC. Mr. Kroening was unsuccessful due to the extremely tight money market at the time and the fact that the rent-up of Golf View *244 had not reached 90 percent occupancy. He informed petitioners that securing a new mortgage at that time was totally unrealistic. Petitioners also contacted all of the bankers they knew as well as a number of other Chicago area lending institutions in an attempt to get new financing for Golf View, but were unable to do so. In a meeting with the FDIC in late December 1975, petitioners told the FDIC they could not find new financing for Golf View, and could not find any buyers for the project. The FDIC then warned petitioners that their construction loan had expired, and that if they didn't find a method to pay off the loan, foreclosure proceedings would be instituted in February 1976. The FDIC, however, suggested that foreclosure could be avoided through the rapid sales of the individual rental units as condominiums if all of the proceeds of such sales were paid over to the FDIC on the construction loan. Petitioners, having no experience with condominiums or condominium conversions, hired Real Estate Associates, a company well experienced in "condominiumizing" apartments throughout the Midwest, to investigate the feasibility of a proposed condominium conversion and to give advice *245 in connection with the project. Petitioners first asked Real Estate Associates if they were willing to buy the Golf View project as a whole from petitioners and then condominiumize it themselves. One of the owners of Real Estate Associates was a banker. He approached his bank in Illinois regarding the purchase of Golf View, but the bank was unwilling to finance the purchase. Thus, in January 1976, in order to avoid foreclosure on the Golf View property, petitioners engaged Real Estate Associates to draw up the declaration for the change to condominiums, to discuss the conversion with the tenants, and to handle the sales for a fee of $2,000 per month plus miscellaneous costs of advertising. Petitioners paid Real Estate Associates a total of $7,149.87 in monthly fees and costs until Real Estate Associates in April 1976 defaulted on the arrangement to provide advertising services for Golf View condominiums. By letter dated February 13, 1976, to James P. Hudson, the FDIC Liquidator of American City Bank, petitioners again made demand upon American City Bank to provide the long-term financing in accordance with the December 27, 1972 agreement. This final demand by petitioners also *246 was unsuccessful. Therefore, by letter dated April 1, 1976 to Mr. Hudson, petitioners proposed to pay off the $1,162,000 construction loan on Golf View Apartments with the proceeds of condominium sales. This letter, which was essentially drafted by the FDIC, contained the proposed terms for the agreement later executed by petitioners and the FDIC. As of April 1, 1976, sales of 20 condominium units had been tentatively arranged with Golf View tenants. [5] On May 20, 1976, petitioners and the FDIC entered into an agreement providing for the payment of the construction loan and the forbearance of any foreclosure action until December 15, 1976. The terms of this so-called "Work-Out Agreement" were: (1) petitioners were to make an initial cash payment of $200,000 on May 20, 1976, the date of the agreement; [6]
(2) FDIC would sign the Consent to the Declaration of Condominium for Golf View Condominiums; (3) all proceeds from the sale of condominiums would be applied to interest, at 12 percent, and then to principal; (4) FDIC would sign 76 partial releases, to be held in trust at Chicago Title Company, to be released upon payment of $17,500 in certified funds for each unit, or upon *247 full payment of the indebtedness at which time the remaining units would be released; and (5) on December 15, 1976, the agreement would be reviewed if the indebtedness had not been paid in full. While petitioners' letter of April 1, 1976 had sought a reduction in the interest rate to 8.5 percent, the Work-Out Agreement retained the rate of 12 percent. On May 20, 1976, petitioners paid the FDIC $200,000 in accordance with the terms of the Work-Out Agreement. A condominium declaration relating to the Golf View property was filed on or about June 1, 1976, in *248 the County Recorder's Office in Walworth County, Wisconsin. Petitioners made arrangements with Chicago Title Insurance Company to convert their "owner's policy" for Golf View to a "master's policy" for the purpose of issuing "take-off policies" to the various condominium unit purchasers. In July and August of 1976, petitioners employed a Wisconsin broker, William Fleishmann, to act as their agent in the sale of condominiums. [7] Petitioners paid William Fleishmann $3,963 in fees and reimbursements of costs during August 1976. In July 1977, petitioners employed Condominium Brokerage, Ltd., to act as their agent in connection with condominium sales. Its activities included advertising, procurement of buyers, and closing procedures. Sales of condominium units occurred as follows: Year
Number of Units
Sales Income
Profits
1976
19
$510,725.00
$218,013.00
1977
25
806,300.00
465,063.00
1978
17
488,247,30
293,726.83
*249 Lyn Jay Realty Partnership's net rental income (loss) for the years 1976, 1977, and 1978, as reflected on the partnership tax returns for those years, was ($237,983.87), ($30,829.46), and $16,400.66, respectively. The rental income came from the unsold Golf View units as well as other rental units owned by petitioners. The partnership deducted advertising expenses related to Golf View of $2,116.94, $3,681.79, and $4,733.82 in 1976, 1977, and 1978, respectively. The partnership deducted maintenance costs related to Golf View of $17,273, $23,128, and $15,955.14 in 1976, 1977, and 1978, respectively. These "maintenance costs" were primarily the association fees or condominium fees petitioners paid on the unsold units. Costs of painting and decorating the Golf View units were $4,312, $7,009, and $2,930 in 1976, 1977, and 1978, respectively. The partnership paid Robert Erfurth a salary of $50,000 in 1976, which was largely a bonus for a lot of work he had done for the partnership in all its activities. As of March 14, 1977, the balance due the FDIC on the construction loan was $388,497.45. [8] Petitioners then secured another short-term loan from the Bank of Bellwood, their local *250 bank in Illinois, in the amount of the current balance due the FDIC on the construction loan. Petitioners used the proceeds of this short-term loan to pay off the FDIC in full on March 21, 1977. That removed the threat of foreclosure by the FDIC, but did not wholly solve petitioners' financial problems. The short-term loan from the Bank of Bellwood carried interest at 10 percent, rather than the 12 percent petitioners had been paying, but petitioners were still required to apply all of the sales proceeds from the condominium units to reduce the outstanding balance of this loan. Although petitioners again sought permanent financing, the bank was willing to make the short-term loan but was not amenable to granting a long-term mortgage on the property. The record does not indicate exactly when petitioners paid off the balance of the loan from the Bank of Bellwood. However, it was a short-term loan. The initial proposal for that loan, dated *251 October 25, 1976, contemplated a six-month term ending April 1977, and contemplated payment of the loan with the proceeds of the sale of 16 of the initial 32 Golf View units that were sold. The record does not establish that proceeds of the sales of the remaining 44 Golf View units had to be paid over to the Bank of Bellwood. After the FDIC was paid off, petitioners attempted to sell the remaining 44 condominium units in bulk. Towne Realty, a broker in Lombard, Illinois, tried to arrange a sale to a couple of investors. This attempt was unsuccessful, so petitioners continued to sell the units individually. As noted earlier, 25 units were sold in 1977, another 17 in 1978, and 3 more in 1979. As of June 1979, there were 12 unsold units at Golf View. These units remained unsold as of the time of trial. Petitioners operated these 12 units as rental property and continued to pay the condominium fees on those units still owned by them. On their Federal income tax returns for 1976, 1977, and 1978, petitioners reported the sales of the Golf View condominium units as capital gains. In his notices of deficiency to petitioners dated February 13, 1981, respondent determined that the *252 Golf View condominium units were held by petitioners primarily for sale to customers in the ordinary course of their trade or business, thereby producing ordinary income on their sale. III. Colonial View Apartments
On March 27, 1972, petitioners obtained a loan and mortgage from First Wisconsin National Bank of Milwaukee (First Wisconsin) for construction of a 60-unit rental apartment complex on a different portion of the Lake Geneva property. Construction was completed in 1973, and from 1973 to 1976 petitioners owned and operated the 60-unit rental complex, known as the Colonial View Apartments. On June 14, 1976, petitioners entered into an agreement selling to Michael R. Sparks the Colonial View Apartments, including land, buildings, improvements and fixtures, for $975,000. As of the date of sale, the amount of the mortgage due First Wisconsin on the Colonial View property was $864,836. Under the terms of the sale, Sparks made no down payment at the time of sale and petitioners received no cash in the year of sale. Sparks gave petitioners his promissory note in the amount of $111,177.60. The note bore interest at five percent and was payable in three years. The balance *253 of the purchase price was to be paid in monthly installments of $7,385. Under the terms of the sales contract, Sparks was to make these monthly payments directly to petitioners' mortgage loan account at First Wisconsin. These monthly payments were equal in amount to the payments that would otherwise have been paid by petitioners to First Wisconsin. The sales contract reads in pertinent part: NOW, THEREFORE, for and in consideration of the premises and the mutual covenants and agreements of the parties hereto, it is agreed as follows: 1. Upon receipt of the total price of Nine Hundred Seventy-five Thousand and no/100 ($975,000.00) Dollars, the Vendors agree to convey to the Purchaser title to the property described by a warranty deed subject to: * * * b. * * * first mortgage dated March 27, 1972, wherein the First Wisconsin National Bank of Milwaukee is mortgagee. * * * 20. Payment of the purchase price of Nine Hundred Seventy-five Thousand and no/100 ($975,000.00) Dollars by Purchaser shall be made and credited as follows: a. Deduction of the prorations to the credit of Purchaser is shown in a closing statement executed by the parties in the amount of $10,106.00. *254 b. Delivery of a promissory note executed by the Purchaser to Vendors in the amount of $111,177.60, bearing interest at the rate of Five (5%) per cent per annum, principal and accrued interest due thereon payable within three (3) years from the date of said promissory note, said promissory note to be executed upon Purchaser's delivery of this executed Land Contract. (Payment of said promissory note may be extended and amended at Purchaser's election pursuant to paragraph 23 of this land Contract as provided hereinbelow.); c. Principal and interest installment payments to be paid by Purchaser on the unpaid principal balance in the amount of $853,716.40 with interest thereon at the annual rate of Nine (9%) per cent per annum in monthly installments of not less than $7,385.00 beginning on the 1st day of March, 1976, and shall be paid by Purchaser to Vendors' loan account with the First Wisconsin National Bank of Milwaukee, thereby reducing principal and interest due and owing on the five (5) promissory notes secured by a first mortgage in favor of the First Wisconsin National Bank of Milwaukee which is a first and prior lien on the above described real estate. Any delinquent installment *255 shall bear interest at the rate of Twelve (12%) per cent per annum and shall be paid by Purchaser to Vendors in order to cure the default of any delinquent installment within thirty (30) days. Vendors agree to convey to Purchaser the above described real estate within three (3) years of the date hereof by executed and acknowledged, warranty deed to Purchaser which shall recite "subject to a mortgage dated March 27, 1972 in favor of the First Wisconsin National Bank of Milwaukee" in the event Purchaser shall execute a mortgage and promissory note in favor of Vendors in the amount of the then existing principal balance due and owing the First Wisconsin National Bank of Milwaukee in consideration for the conveyance by said warranty deed by Vendors in the form of a purchase money mortgage at the rate of Nine (9%) per cent per annum in good and recordable form under Wisconsin Statutes, payable in monthly installments of principal and interest in an amount necessary to amortize said principal amount with interest as it accrues over the term remaining on the mortgage of the Vendors with the First Wisconsin National Bank of Milwaukee which shall remain a first and paramount lien on the *256 above described real estate. This purchase money mortgage and note shall contain a provision to the effect that the liability of the Purchaser is limited to the land secured by the purchase money mortgage and that the holder of such purchase money mortgage and note shall not be entitled to seek or obtain a deficiency judgment against the Purchaser, but shall only be entitled to foreclose the lands covered by said purchase money mortgage to the favor of Vendors. Such purchase money mortgage shall also contain a provision to the effect that Vendors will consent to assignments of the Purchaser's interest, should the successor in interest or assignee of the Purchaser assume the terms and conditions of said purchase money mortgage. The Vendors shall apply all principal and interest payments to be made on the said purchase money mortgage made by Purchaser to the Vendors to the First Wisconsin National Bank of Milwaukee to reduce the principal and interest of said first mortgage until such time as all of the land involved in this transaction has been released from the lien of said first mortgage. Vendors agree that payments pursuant to said purchase money mortgage and the promissory *257 note as secured thereby by Purchaser may be made directly to the First Wisconsin National Bank of Milwaukee and applied against the indebtedness secured by said purchase money mortgage. It is expressly agreed and understood between the parties hereto that Purchaser does not hereby assume the first mortgage to the First Wisconsin National Bank of Milwaukee and Purchaser shall, at no time during the pendency of this Land Contract or the duration of the purchase money mortgage in favor of Vendors, be personally liable for payments or the indebtedness to the First Wisconsin National Bank of Milwaukee. [Emphasis in exhibit as submitted to the Court.] Petitioners' adjusted basis in Colonial View at the time of sale was $802,861. Petitioners elected to report income from the sale of Colonial View on the installment method. In his notices of deficiency to petitioners dated February 13, 1981, respondent determined that in the sale of the Colonial View Apartments to Sparks, Sparks assumed petitioners' mortgage due First Wisconsin or took the property subject to the mortgage. Thus respondent, applying section 1.453-4(c), Income Tax Regs., determined that *258 the excess of the mortgage over the property's adjusted basis constituted a payment received by petitioners in the year of sale, a payment in the amount of $61,975. Petitioners incurred recording and appraisal fees in the amount of $14,632.13 and loan costs in the amount of $7,744 in connection with the purchase and sale of the Colonial View Apartments. These amounts were deducted as an expense on the 1976 Lyn Jay Realty partnership tax return. In his notices of deficiency to petitioners, respondent determined that these amounts were capital expenditures and must be offset against the amount realized from the sale of the respective property. OPINION The first issue for decision is whether the gains realized by petitioners on the sales of the Golf View condominium units were capital gains or ordinary income. Resolution of this issue depends on whether petitioners held the condominium units primarily for sale to customers in the ordinary course of their trade or business. [9] Respondent determined that petitioners held the condominium units primarily for sale to customers in the ordinary course of their trade or business, and thus any gains realized on their sales should be taxed *259 as ordinary income. Petitioners argue that they did not hold the condominium units as respondent determined, and that they should therefore receive capital gains treatment pursuant to the general rule of section 1231. Petitioners contend that they are rental property operators who were forced to convert rental property into condominium units due to the immediate threat of foreclosure. There is no specific provision in the Internal Revenue Code regarding the taxation of condominium *260 unit sales following a conversion of rental property to condominium status. The parties have not cited and we have not found any cases dealing with this specific issue. This dearth of cases is no doubt due to the fact that normally such a conversion from rental operation to sales of condominium units would generate ordinary income. In other words, the owner of the apartment building would simply change his operation from that of a rental business to that of a dealer in condominium units, selling the property to customers in the ordinary course of his new trade or business. That is how respondent views the present case; petitioners see it differently. Both parties cite and rely on the long line of cases involving subdivisions, real estate developers, and the infinitely variable combinations and permutations of facts and circumstances involved in the same. Unfortunately, we must do likewise. Thus, to decide this case we look to those principles which are of general application in determining proper tax treatment of sales of real property. In applying those principles, litigants are cautioned *261 that "each case must be decided on its own peculiar facts. * * * Specific factors, or combinations of them are not necessarily controlling." Biedenharn Realty Co. v. United States,526 F.2d 409, 415 (5th Cir. 1976); Hansche v. Commissioner,457 F.2d 429, 432 (7th Cir. 1972); Thompson v. Commissioner,322 F.2d 122, 127 (5th Cir. 1963); Wood v. Commissioner,276 F.2d 586, 590 (5th Cir. 1960). Respondent determined that petitioners held the Golf View condominium units primarily for sale to customers in the ordinary course of their trade or business, thus excluding them from capital gains treatment. Respondent bases his determination on the course of conduct petitioners followed in disposing of the condominium units. Respondent contends that the way petitioners went about selling the condominium units, when measured against certain key factors applicable to sales of subdivided real estate, should lead us to find that the condominium units were held by petitioners primarily for sale to customers in the ordinary course of their trade or business. In deciding whether petitioners held the condominium units *262 primarily for sale to customers in the ordinary course of their trade or business, we need to analyze two elements. First, were the units held primarily for sale? Second, were the sales of the units in the ordinary course of petitioners' trade or business? In determining whether petitioners held the condominium units primarily for sale, the word "primarily" has been interpreted to mean "principally" or "of first importance." Malat v. Riddell,383 U.S. 569 (1966). A taxpayer's original purpose in acquiring a particular piece of property, though pertinent, is not determinative of how the gain from the subsequent sale of the same property will be treated for tax purposes. Jersey Land and Development Corp. v. United States,539 F.2d 311, 315 (3d Cir. 1976); Ehrman v. Commissioner,120 F.2d 607, 610 (9th Cir. 1941), cert. denied 314 U.S. 668 (1941); Bynum v. Commissioner,46 T.C. 295, 299 (1966). These cases look to the taxpayer's primary purpose in holding the property at the time of sale in determining whether *263 the gain therefrom will qualify as capital gains or be taxed as ordinary income. In the present case, petitioners' original purpose in constructing and holding the Golf View property was to operate it as rental property. This purpose conformed to the pattern of petitioners' real estate business as they had conducted it since 1961. In this instance, faced with the bankruptcy of the bank that had committed to furnish the permanent financing of the rental property, with the FDIC's refusal to honor that permanent loan commitment, and with the FDIC's threat to foreclose on the property if the then overdue construction loan was not paid off immediately, petitioners adopted the FDIC's suggestion to convert to condominium status and pay over all of the sales proceeds to the FDIC to avoid foreclosure. Thus, while at the very moment of the sales, we agree petitioners intended to sell the condominium units, we think this hardly constitutes holding primarily for sale to customers. In other words, under all the facts and circumstances of this case, we think petitioners' original holding purpose has some enduring vitality and is not wholly irrelevant. We will consider that original purpose or *264 intent further in discussing the second element. The next element to be reviewed is whether the sales of the condominium units were in the ordinary course of petitioners' trade or business. There is no clearly defined test for resolving this question. Many courts, including this one, have relied on a congeries of factors to determine whether property is held for sale in the ordinary course of a taxpayer's trade or business. Although we are mindful that specific factors or combinations of factors are not necessarily controlling, and that each case must be decided on its own particular facts, resort to these classic factors provides us at least with a starting point for our analysis. The factors, enumerated in United States v. Winthrop,417 F.2d 905, 910 (5th Cir. 1969), are: (1) the nature and purpose of the acquisition of the property and the duration of ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity, *265 and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales. These factors have varying degrees of relevancy depending on the particular factual situation, and all may not be applicable to any given case. S & H, Inc. v. Commissioner,78 T.C. 234, 244 (1982); Buono v. Commissioner,74 T.C. 187, 199 (1980). Some of these "Winthrop factors" are more meaningful in a subdivision case than in a condominium conversion case. Several cases have emphasized that the frequency and substantiality of sales is the most important objective factor in determining whether a taxpayer's activities were conducted in the ordinary course of his trade or business. Suburban Realty Co. v. United States,615 F.2d 171, 178 (5th Cir. 1980); Biedenharn Realty Co. v. United States,supra,526 F.2d at 416; *266 Buono v. Commissioner,supra,74 T.C. at 200; Gamble v. Commissioner,68 T.C. 800, 812 (1977). Frequent and substantial sales are relevant to both the taxpayer's purpose in holding the property and the existence of a trade or business. See, e.g., Suburban Realty Co. v. United States,supra,615 F.2d at 178. In the present case, respondent points to the 61 sales of condominium units over the three years in issue as showing the frequency of petitioners' sales activity. Respondent also argues these sales were substantial when one compares the dollar amount of the profits from the sales with the dollar amount of petitioners' net rental income from other units for the same years. Profits from the condominium unit sales totaled $218,013, $465,063, and $293,726.83 for 1976, 1977, and 1978, respectively. Petitioners' net rental income (loss) for those same years were ($237,983.87), ($30,829.46), and $16,400.66, respectively. Respondent argues this disparity signifies that the sales activity constitutes a trade or business. However, respondent fails to consider the fact that petitioners were required to turn over all of the *267 proceeds of the condominium unit sales, not just the paper profits, to the FDIC to retire the outstanding construction loan and thereby avoid foreclosure. Further, petitioners point out, and we think it significant, that their Illinois rental units had net incomes of approximately $54,000, $98,000, and $90,000 in 1976, 1977, and 1978, respectively. These three net income figures include depreciation deductions, a noncash expense, of approximately $40,000 per year. Therefore, petitioners' Illinois rental income was substantial when compared to the profits reported from the condominium unit sales. It was the Golf View property that had substantial rental losses in those years. Petitioners had to pay the condominium fees on all of the unsold units at Golf View. It is respondent's position that petitioners simply enlarged or modified their existing trade or business of managing and operating rental property to include conversion of rental units to condominiums and sales of those units to tenants or other customers. However, the underlying facts and circumstances of petitioners' conversion of Golf View Apartments into condominiums lead us to conclude that the sales of the condominium *268 units were not made in the ordinary course of petitioners' trade or business, at least not while they were acting under the threats of the FDIC to foreclose. Since 1961, petitioners had been engaged in the business of constructing or acquiring apartment buildings and operating those buildings as rental property. The Golf View project was intended to follow the same pattern, but because of circumstances beyond petitioners' control, it did not turn out that way. In 1972, American City Bank agreed in writing to lend petitioners $1,162,000 for 15 months to construct the Golf View Apartments. American City Bank further agreed in writing that at the time the construction loan was due, it was to be converted to a 25-year mortgage. Petitioners completed construction of Golf View in June of 1974 and began renting the apartments. In accordance with their agreement with American City Bank, petitioners were ready to close on the 25-year mortgage on October 1, 1974. However, the bank on two occasions "implored" petitioners to extend the construction loan and the closing date for the permanent financing and reduced petitioners' interest rate to 8.5 percent, the agreed upon rate for the permanent *269 financing. Petitioners agreed to the two extensions to December 1, 1975. Then, a few weeks before petitioners were to close on the 25-year mortgage in 1975, petitioners learned that American City Bank was insolvent. The FDIC, appointed as American City Bank's Receiver, then informed petitioners that the FDIC would not honor American City Bank's written promise to provide a 25-year mortgage on the Golf View property. Further, the FDIC informed petitioners that the $1,162,000 construction loan was then due and considered in default. The FDIC then raised the interest rate on the construction loan from 8.5 percent to 12 percent, and warned petitioners that foreclosure proceedings would be instituted in two months if the loan was not paid in full. Petitioners sought to find a buyer for the project or to obtain alternative financing but were unable to do so due to a depressed mortgage market at the time. The FDIC suggested that petitioners convert to condominium form and sell the individual units. Seeking to avoid foreclosure at all costs, petitioners followed the advice of the FDIC to convert the apartments to condominiums and pay off the construction loan with the condominium sales *270 proceeds. Respondent now contends that petitioners' original holding purpose or intent, to operate Golf View as rental property, is no longer controlling, and seeks to tax petitioners on the condominium unit sales as if they were dealers in such property. We think this case is one of a very few where the first Winthrop factor should be accorded more importance because of the forced change of purpose. In Biedenharn Realty Co. v. United States,supra,526 F.2d at 409, the Fifth Circuit considered the question of when a taxpayer's prior investment intent in real property will endure and control despite substantial sales activity. It stated: We reject the Government's sweeping contention that prior investment intent is always irrelevant. There will be instances where an initial investment purpose endures in controlling fashion notwithstanding continuing sales activity.We doubt that this aperture, where an active subdivider and improver receives capital gains, is very wide; yet we believe it exists. We would most generally find such an opening where *271 the change from investment holding to sales activity results from unanticipated, externally induced factors which make impossible the continued pre-existing use of the realty.Barrios Estate,supra, [10] is such a case. There the taxpayer farmed the land until drainage problems created by the newly completed intercoastal canal rendered the property agriculturally unfit. The Court found that taxpayer was "dispossessed of the farming operation through no act of her own." Supra at 518. Similarly, Acts of God, condemnation of part of one's property, new and unfavorable zoning regulations, or other events forcing alteration of taxpayer's plans create situations making possible subdivision and improvement as a part of a capital gains disposition. * * * However, we caution that although permitting a land owner substantial sales flexibility where there is a forced change from original investment purpose, we do not absolutely shield the constrained taxpayer from ordinary income. That taxpayer is not granted carteblanche to undertake intensely all aspects of a full blown *272 real estate business. Instead, in cases of forced change of purpose, we will continue to utilize the Winthrop analysis discussed earlier but will place unusually strong taxpayer-favored emphasis on Winthrop's first factor. [Emphasis added. Fn. ref. omitted.] Biedenharn Realty Co. v. United States,supra,526 F.2d at 421, 422. Based on the particular facts and circumstances of the present case, we find that petitioners' original purpose in constructing and holding the Golf View property, to operate it as rental property, endured in controlling fashion notwithstanding the subsequent sales of the rental units as condominiums. Petitioners changed their original purpose of operating Golf View as rental apartments in order to avoid the FDIC's threat of foreclosure on the property. The threat of foreclosure was not due to any actions, nonactions, or miscalculations by petitioners. Petitioners were entitled to rely on their agreement with American City Bank that the bank would furnish the long-term financing petitioners needed to operate Golf View as rental property. *273 Only weeks before petitioners were ready to close on the long-term mortgage was American City Bank declared insolvent and were petitioners informed of American City Bank's insolvency. Not only was their long-term mortgage disaffirmed by the FDIC, but the FDIC demanded immediate payment of the $1,162,000 construction loan. The FDIC knew petitioners planned to pay off the construction loan with the proceeds of the long-term mortgage. Despite this knowledge, the FDIC threatened foreclosure on the property if the construction loan was not paid off in two months. Thus, we find that the change from petitioners' original purpose of operating Golf View as rental property to that of selling the individual units as condominiums resulted from unanticipated, externally induced factors which made petitioners' pre-existing rental use of the realty impossible. Respondent argues that petitioners' efforts in selling the condominium units rise to a level such that petitioners should be considered in the trade or business of selling condominium units. Respondent points to petitioners' actions in, and control over, the condominium unit sales activities. Respondent also draws our attention to the *274 additional advertising and decorating expenses petitioners incurred in converting the apartments to condominiums. We realize that petitioners were not granted carte blanche to undertake all aspects of a full-blown real estate sales business. We find, however, that the actions taken by petitioners were limited to, and consistent with, their underlying objective to remove the FDIC's threat of foreclosure. We conclude, therefore, that based on the particular facts surrounding this case, petitioners did not hold the Golf View condominium units primarily for sale to customers in the ordinary course of their trade or business while they were under the FDIC threat of foreclosure. Because of the forced change of purpose thrust upon petitioners by the FDIC's threats, we think petitioners' initial purpose "endures in controlling fashion" and remains relevant here, as discussed in Biedenharn Realty Co. v. United States,supra.We further conclude that petitioners here can squeeze through the exceedingly narrow aperture or niche contemplated but not found in that case. [11] Thus, petitioners properly reported the gains on the sales of the condominium units as capital gains *275 for the period that they were under the threat of foreclosure by the FDIC, i.e., until the construction loan was paid off in March of 1977. *276 However, we cannot reach the same result for the period after the FDIC exited the scene. While petitioners' financial problems may not have been wholly solved after they paid off the construction loan and eliminated the threat of foreclosure by the FDIC, the record is murky as to the subsequent period. Petitioners argue that they continued to pay the proceeds from the sale of condominium units to the Bank of Bellwood. However, the loan from the Bank of Bellwood was a short-term loan. The record does not establish when or how petitioners paid off that loan. The original proposal for the loan, dated in October of 1976, called for a six-month term ending in April of 1977 and indicated that it would be paid for with the proceeds of the sales of 16 of the first 32 units that had been sold up to that time. If that is what happened, then the 44 units remaining unsold at the time the FDIC was paid off were not held hostage to the short-term loan from the Bank of Bellwood. Petitioners have not established what happened to the sales proceeds of the remaining units, and we are unwilling to speculate about the matter. Petitioners have failed to prove that they did not hold the remaining *277 44 units for sale to customers in the ordinary course of their trade or business. Petitioners still owned 12 of those units at the time of the trial. The second issue for decision involves petitioners' sale of the Colonial View Apartments to Michael Sparks in June 1976. We must decide whether the purchaser (Sparks) took the property subject to a mortgage petitioners owed to the First Wisconsin National Bank of Milwaukee. [12] Respondent determined that Sparks did take the Colonial View property subject to the mortgage due First Wisconsin. Petitioners argue to the contrary. *278 Petitioners reported their gain on the sale of Colonial View under the installment method pursuant to section 453. [13] At the time of sale, the amount of the mortgage due First Wisconsin exceeded petitioners' basis in Colonial View by approximately $62,000. Respondent, applying section 1.453-4(c), Income Tax Regs., determined that this excess of mortgage over basis constituted a payment received by petitioners in the year of sale. *279 Section 1.453-4(c), Income Tax Regs., dealing with the sale of mortgaged property on the installment basis, provides as follows: (c) Determination of "selling price". -- In the sale of mortgaged property the amount of the mortgage, whether the property is merely taken subject to the mortgage or whether the mortgage is assumed by the purchaser, shall, for the purpose of determining whether a sale is on the installment plan, be included as a part of the "selling price"; and for the purpose of determining the payments and the total contract price as those terms are used in section 453, and §§ 1.453-1 through 1.453-7, the amount of such mortgage shall be included only to the extent that it exceeds the basis of the property. The term "payments" does not include amounts received by the vendor in the year of sale from the disposition to a third person of notes given by the vendee as part of the purchase price which are due and payable in subsequent years. Commissions and other selling expenses paid or incurred by the vendor shall not reduce the amount of the *280 payments, the total contract price, or the selling price. [Emphasis added.] The purpose of the regulation was to make it possible to tax the entire profit during the period the purchase moneys were being received where a sale was reported on the installment basis, and the purchaser either assumed the mortgage or took the property subject to it. Estate of Lamberth v. Commissioner,31 T.C. 302, 315 (1958). The regulation was not intended to apply to every sale of mortgaged property, but only to those situations where only part of the total selling price would be paid directly to the seller by the purchaser, the remaining part being paid by the purchaser directly to the mortgagee. Burnet v. S & L Bldg. Corp.,288 U.S. 406 (1933); Stonecrest Corp. v. Commissioner,24 T.C. 659 (1955). In Stonecrest, we concluded that the expression "subject to a mortgage," as used in the regulations under section 453, should be given the meaning customarily attributed to it as it relates to the transfer of mortgaged property. We then explained this *281 customary meaning as follows: Taking property subject to a mortgage means that the buyer pays the seller for the latter's redemption interest, i.e., the difference between the amount of the mortgage debt and the total amount for which the property is being sold, but the buyer does not assume a personal obligation to pay the mortgage debt. The buyer agrees that as between him and the seller, the latter has no obligation to satisfy the mortgage debt, and that the debt is to be satisfied out of the property. Although he is not obliged to, the buyer will ordinarily make the payments on the mortgage debt in order to protect his interest in the property. * * * Stonecrest v. Commissioner,supra,24 T.C. at 666. In determining whether all the elements of taking property subject to a mortgage are present in the instant case, we must consider all the facts and the import of all the documents executed by the parties to the contract. Goodman v. Commissioner,74 T.C. 684, 713 (1980), affd. without published opinion 673 F.2d 1332 (7th Cir. 1981). *282 In Goodman, a sale of mortgaged property involved a wraparound mortgage given by the buyer to the seller. Under the terms of the sales contract, the payments on the wraparound mortgage were made by the buyer to a banking institution, which was to deduct from each payment the amount of the underlying debt and remit this amount to the underlying mortgagee. We held that the banking institution was a conduit for payments directly from the buyer to the mortgagee. We found, based on those facts, that in substance only part of the selling price would be paid directly to the seller by the buyer, the remaining part being paid by the buyer directly to the mortgagee. We therefore held that the buyer took the property subject to the underlying mortgage. Goodman v. Commissioner,supra,74 T.C. at 714. In the present case, petitioners sold Colonial View to Sparks for $975,000. Sparks gave petitioners his personal promissory note in the amount of $111,177.60, which was due three years from the date the sales contract was executed. This amount was, in effect, payment to petitioners for their "redemption interest" in Colonial View. Under paragraph 20.c of the contract, *283 the balance of the purchase price was to be paid by Sparks in monthly installments of $7,385. These monthly payments were equal in amount to the payments petitioners were making on the underlying mortgage due First Wisconsin. Further, the terms of the contract expressly stated that Sparks was to make these monthly payments directly to petitioners' mortgage loan account at First Wisconsin. Petitioner Robert Erfurth testified that the reason Sparks was to make the payments directly to the mortgagee was that "it just was a lot less bookkeeping for us since we were just going to turn the payments over to First Wisconsin anyway." In any event, we think that since Sparks was required to make the monthly payments directly to the mortgagee, that in substance only part of the selling price would be paid directly to petitioners from Sparks. We think this is strong evidence that Sparks took the property subject to the mortgage. Under the terms of the contract, petitioners did not convey title to Colonial View on the date the contract was executed. Petitioners agreed to convey title within three years of the date of execution. When petitioners did convey title, the purchaser was required *284 to give petitioners a promissory note and mortgage (purchase money mortgage) equal in amount to the then outstanding balance of the underlying mortgage due First Wisconsin. The sales contract then states that this purchase money mortgage shall contain a provision to the effect that the liability of the purchaser is limited to the property secured by the purchase money mortgage. Thus, the purchaser's debt is to be satisfied out of the property. This fact also is strong evidence that Sparks took the property subject to the mortgage. Petitioners argue that the property was not taken subject to the mortgage since no conveyance of title was made in the year of sale. However, we have previously held that application of the regulation in issue does not depend directly on whether title was conveyed. Hunt v. Commissioner,80 T.C. 1126, 1141 (1983); Estate of Lamberth v. Commissioner,supra,31 T.C. at 317. [14]
*285 Thus, based on the facts, we find that Sparks paid petitioners for the latter's redemption interest in the property. We find that Sparks did not assume a personal obligation to pay the underlying mortgage due First Wisconsin. We also find that as between petitioners and Sparks, petitioners had no obligation to satisfy the mortgage debt since Sparks was making the monthly payments directly to the mortgagee. Further, Sparks' liability is limited to the property itself. We conclude, therefore, that Sparks did take the Colonial View property subject to the mortgage due First Wisconsin. Thus, under section 1.453-4(c), Income Tax Regs., the excess of the mortgage over the property's basis constitutes a payment received by petitioners in the year of sale. [15]
*286 The remaining issue for decision concerns appraisal fees, recording fees, and loan costs totaling $22,376.13 that petitioners incurred in connection with the purchase and sale of Colonial View to Sparks. On their partnership tax return for the year 1976, petitioners deducted the $22,376.13 as an ordinary and necessary expense incurred in their rental property business. Respondent determined that these amounts were capital expenditures, and therefore must be added to petitioners' adjusted basis in Colonial View in determining the amount of gain petitioners realized on the sale of Colonial View. The parties to this case have stipulated that petitioners' adjusted basis in Colonial View at the time of sale was $802,861. In reporting the sale of Colonial View on their partnership tax return for the year 1976, petitioners used an adjusted basis for Colonial View of $780,484.33. The difference between these two figures is $22,376.67. [16]
Respondent contends that on audit his examiner added the $22,376.13 in fees to petitioners' cost of the property in determining their adjusted *287 basis for purposes of reporting gain. Respondent argues that the $22,376.13 petitioners seek to deduct as current expenses is already included in the $802,861 adjusted basis to which the parties have stipulated. Respondent says that to permit petitioners an additional deduction for these fees would amount to duplication. We agree. Petitioners seem to agree also, since in their Reply Brief they offered no argument to respondent's explanation of the treatment of $22,376.13 as an adjustment to basis. Thus, we find that the $22,376.13 petitioners expended in various fees and costs is reflected in petitioners' adjusted basis of $802,861 in Colonial View, and therefore petitioners are not permitted an ordinary business expense deduction for this amount in 1976. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. The section 6654 additions were not mentioned by either party in their statements of the issues to be decided by the Court, at trial, or in their post-trial briefs. Respondent's opening brief stated that other issues raised in the statutory notice "have been conceded or abandoned by the parties." We assume the parties have disposed of the section 6654 addition, and we will not address the issue.↩
2. On brief, petitioners contend the sale of this complex was due to a dispute between Henry Erfurth and Lewis Pranno, and was by mutual agreement. However, the record lacks any evidence on this matter.↩
3. These one-story, shopping center-style stores had been constructed in the 1950's by Henry Erfurth, prior to his partnership with Robert Erfurth.↩
4. Actually, the Comptroller of the Currency declared American City Bank to be insolvent and appointed the FDIC as Receiver to liquidate the bank's business. The record is not wholly clear as to whether petitioners learned all of these things before or at the first meeting with the FDIC Liquidator held in late October or early November of 1975.↩
5. The stipulation of facts states in paragraph 37 that as of April 1, 1976, 20 condominium units had been "sold." We are using this "tentatively arranged" language since sales of the units could not be consummated until the condominium declaration was filed, which was done on or about June 1, 1976. Further, the record indicates, and the parties have stipulated in paragraph 52, that only 19 units were sold during 1976. ↩
6. By letter dated April 2, 1976, the Bank of Bellwood (petitioners' local bank in Illinois) agreed to a 30-day loan commitment to petitioners in the amount of $200,000 to be used as this initial payment.↩
7. Petitioner Henry Erfurth was a licensed real estate broker in the State of Illinois during this time. Wisconsin state law had its own licensing requirements for nonresident brokers which were mandatory. Since Henry Erfurth was not a licensed broker in the State of Wisconsin, he could not act as broker in the sale of the condominium units. Robert Erfurth was not licensed as a real estate broker in either Illinois or Wisconsin. These outside brokers received their sales commissions at the closing of each sale of a unit.↩
8. The stipulation of facts recites this amount as $488,497.45. However, the underlying document states the amount as $388,497.45, and we assume this is the correct figure and that the figure in the stipulation is a typographical error.↩
9. Under section 1231, gain from the sale of real or depreciable property used in the taxpayer's trade or business, which has been held for more than 6 months (9 months for 1977; one year for 1978), can qualify for capital gains treatment. However, section 1231(b)(1)(B)↩ states an exception to this rule for property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. If the exception applies, capital gains treatment is not available, and ordinary income treatment applies.
10. Barrios Estate v. Commissioner,265 F.2d 517↩ (5th Cir. 1959).
11. Only a few cases have found the "liquidation niche" left open in Biedenharn Realty, but under the facts and circumstances of a particular case a taxpayer may liquidate his investment piecemeal or over a period of time and still retain the benefits of capital gains treatment. See Buono v. Commissioner,74 T.C. 187 (1980) and Planned Communities, Inc. v. Commissioner,T.C. Memo. 1980-555. Compare Van Bibber v. Commissioner,T.C. Memo. 1985-344, and Enslin v. Commissioner,T.C. Memo. 1982-430. For an earlier line of such liquidation cases, see Chandler v. United States,226 F.2d 403, 405-406 (7th Cir. 1955); McGah v. Commissioner,210 F.2d 769 (9th Cir. 1954), revg. 17 T.C. 1458 (1952); and Three States Lumber Co. v. Commissioner,158 F.2d 61, 64↩ (7th Cir. 1946), revg. a Memorandum Opinion of this Court.
12. In framing the issues for decision in this case, respondent states this issue as whether the purchaser of Colonial View either took the property subject to the mortgage due First Wisconsin or assumed the mortgage due First Wisconsin. On brief, however, respondent argues only that the purchaser took the property subject to the mortgage, failing to address the question of whether the purchaser assumed the mortgage. Generally, when a purchaser assumes a mortgage on property, he promises the seller to pay off the mortgage debt. This promise of the purchaser can ordinarily be enforced by the mortgagee. See Stonecrest Corp. v. Commissioner,24 T.C. 659, 666↩ (1955). In the present case, the sales contract between petitioners and Sparks expressly states that the purchaser (Sparks) is not assuming the mortgage due First Wisconsin, and that at no time shall Sparks be personally liable on the mortgage. Based on these facts, we would find that Sparks did not assume the mortgage due First Wisconsin. We assume that respondent came to the same conclusion.
13. Under the installment method, the seller returns as income the proportion of the payments actually received in a particular year that the gross profit on the sale bears to the total contract price. Where a mortgage is assumed or where property is sold subject to a mortgage, the statutory scheme does not reach all of a seller's profit, since the total amount of the selling price is not paid over by the buyer to the seller, but is paid by the buyer directly to the mortgagee. This has long since been remedied by section 1.453-4(c), Income Tax Regs., and its predecessors. See Stonecrest Corp. v. Commissioner,supra,24 T.C. at 665↩.
14. In Estate of Lamberth, we held that conveyance of title was important because, under the agreement there involved, the buyer was to make payments directly to the mortgagee after title was conveyed. Thus, on the facts in Lamberth, conveyance of title was the occasion for the transaction to become subject to the underlying debt under the Stonecrest↩ "subject to" analysis. In deciding this issue in the present case, petitioners not conveying title to Sparks in the year of sale is irrelevant since Sparks was to make the monthly payments directly to the mortgagee even before he received title to the property.
15. On brief, petitioners argue that respondent's determination on this issue constitutes double taxation, since petitioners reported all their recognized gain on the sale in 1980. The mitigation provisions in the Code (sections 1311-1314), however, are designed to give taxpayers relief from having paid tax on the same gain twice.↩
16. The 54-cent difference in the two figures ($22,376.67 and $22,376.13) is due to rounding errors.↩